```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
2                      Norfolk Division

3    - - - - - - - - - - - - - - - - - -
                                       )
4    SHOPNTOWN, LLC,                   )
                                       )
5            Plaintiff                 )    CIVIL ACTION NO.
                                       )    2:08cv564
6    v.                                )
                                       )
7    LANDMARK MEDIA ENTERPRISES, LLC,  )
                                       )
8            Defendant.                )
     - - - - - - - - - - - - - - - - - -
9

10                   TRANSCRIPT OF PROCEEDINGS

11                      (Markman hearing)

12                      Norfolk, Virginia

13                       July 13, 2009

14

     BEFORE:   THE HONORABLE RAYMOND A. JACKSON
15             United States District Judge

16

     APPEARANCES:
17

             LECLAIR RYAN PC
18           By:  Alan D. Albert
                      And
19           PROSKAUER ROSE LLP
             By:  Jeremy P. Oczek
20                Steven M. Bauer
                  Counsel for the Plaintiff
21

             WILLCOX & SAVAGE PC
22           By:  Conrad M. Shumadine
                  Michael R. Katchmark
23                    And
             WOODCOCK WASHBURN LLP
24           By:  Steven Rocci
                  Gary Levin
25                Counsel for the Defendant
```

```
1            (Hearing commenced at 11:36 a.m.)

2            THE CLERK:  ShopNTown, LLC, versus Landmark Media

3    Enterprises, LLC, et al, in case number 2:08cv564.

4            Plaintiff ready to proceed?

5            MR. ALBERT:  We are, Your Honor.

6            THE CLERK:  Defendants ready to proceed?

7            MR. SHUMADINE:  We are, Your Honor.

8            THE COURT:  All right.  Good morning, ladies and

9    gentlemen.  We are here this morning to address the matter of

10   claim constructions and some motions.  I want to

11   preliminarily deal with a couple of motions that are still

12   outstanding.

13           Now, I understand that we received discovery motions

14   that Mr. Albert communicated with my office on a few days

15   ago, and I hope that those motions, some of them went to the

16   magistrate.  Did you contact the magistrate about any of

17   those motions?

18           MR. ALBERT:  We initially contacted the magistrate,

19   or we actually spoke --

20           THE COURT:  You can step to the podium.

21           MR. ALBERT:  Thank you, Your Honor.  Just for the

22   record, Alan Albert.  I believe we originally contacted your

23   courtroom deputy, and we were told to sit tight until we got

24   some direction on whether those matters should go to the

25   magistrate.  Obviously, the parties can speak with the
```

1  calendar clerk and get those -- are there particular motions

2  that you wanted to refer, Your Honor?

3  　　　　THE COURT:  Let's put it this way, Mr. Albert.  I

4  have to go back and take a look, but as I understood it when

5  you initially called in, there are a series of discovery

6  motions.  And our tradition is that the magistrate will

7  handle the discovery motions, and a lot of the substance

8  motions, the district court retains.

9  　　　　MR. Albert:  Okay.

10  　　　　THE COURT:  So it is my understanding, at least I

11  thought, because I had to communicate with my law clerk, you

12  spoke with my law clerk at some point -- Okay.  You left a

13  message.  Okay.  And I thought that maybe they had gone to

14  the magistrate judge.  If they have not, before we leave here

15  today, we will find out what is outstanding and figure we get

16  them resolved, get them in the right place.

17  　　　　MR. ALBERT:  Yes, sir.  You recall we sent a letter

18  over on Friday that lists the motions and the docket entries.

19  If you like, I can hand that up to the clerk at some point.

20  　　　　THE COURT:  Well, did you -- I didn't notice on that

21  letter.  Did you share that letter with your opposing

22  counsel?

23  　　　　MR. ALBERT:  I believe we did, Your Honor.

24  　　　　THE COURT:  I didn't see anything on there.  I was

25  looking.

1            MR. ALBERT:  I'm very sorry if that was not the

2      case.

3            THE COURT:  I was expecting to get a letter from the

4      parties.  What I got was a letter signed by you, and I didn't

5      see any certificate to the opposing counsel.  So I thought,

6      uh, oh, I'm getting ready to read an ex parte communication

7      here.

8            MR. ALBERT:  I understand, Your Honor.

9            THE COURT:  I haven't done much with your letter

10     here.

11           MR. ALBERT:  I understand, Your Honor.  All it is is

12     just a list of the pending motions as we discussed on the

13     phone on Thursday, I believe it was.

14           THE COURT:  My expectation always, if I'm going to

15     get a letter or communication from one of the parties, I

16     expect to see a certificate of service to the opposing party

17     or either a joint signature; otherwise, I don't put too much

18     stock in it.  I try to avoid that.

19           MR. ALBERT:  Absolutely, Your Honor.  It was my

20     understanding it had gone over there, but I was doing this

21     from New York.  So my apologies if it did not.

22           THE COURT:  All right.  Anyway, we are going to

23     address the matter.  We will be straight when we leave here

24     where we stand on all of these motions.  Thank you, sir.

25           MR. ALBERT:  Not at all.  Thank you.

1        THE COURT:  First thing we have here this morning I
2    want to talk about, I think is ripe for some determination is
3    this motion to strike, to preclude the plaintiffs from
4    asserting certain additional claims with respect to claim 21.
5    I want to address that.  Who would be speaking on that?
6    Mr. Shumadine?
7        MR. SHUMADINE:  May it please the Court.  May I,
8    before I proceed, just introduce my group of people because
9    I'd like you to know who's here today, if you don't mind.
10       THE COURT:  You have about seven, I understand, out
11   there.
12       MR. SHUMADINE:  Beside me is Mr. Steven Rocci.  He
13   is with the Woodcock Washburn firm, and he is our lead
14   counsel.  And beside him is Gary Levin.
15       MR. LEVIN:  Good morning.
16       MR. SHUMADINE:  And they will be both addressing you
17   today.  And behind them is Michael Koptiw.  Mr. Koptiw is
18   with the Woodcock Washburn firm.  He will not be saying
19   anything today, but he's going to hopefully keep us straight.
20   And behind me is my distinguished client, Frank Batton, Jr.,
21   and beside him is Rusty Furdell, Landmark general counsel,
22   and my partner, Michael Katchmark, who I know you know.
23       THE COURT:  Right.
24       MR. SHUMADINE:  Behind him is Scott Cardy of our MIS
25   department, who swears to me that any audio-visual

1 presentation done by us will work, and that is a big thing

2 because, as you know, there is very little likelihood it

3 would work if it depended upon me.

4 　　　　May it please the Court.  We regard the motion as

5 very, very important because, as this Court is aware, in

6 order for the rocket docket to function, the orders and

7 procedures of the Court have to be followed.  And the

8 addition of major claims out of order and out of time are

9 always prejudicial and significantly prejudicial.

10 　　　　I make no apologies to the Court for suggesting that

11 the supplemental scheduling order that was entered by the

12 Court be entered and negotiated with the parties.  I thought

13 it was terribly important that we know what the claims were

14 and that we had a road map so we could deal with this case in

15 a systemic and orderly fashion.

16 　　　　The supplemental scheduling order, which was entered

17 by the Court, makes it plain that on March 11th, ShopNTown,

18 to make a good faith effort to identify all patent claims it

19 contends are infringed based on information reasonably

20 available to it at that time.

21 　　　　March 25th, there was the parties will have

22 exchanged claim terms they believe require construction.

23 March 31st, parties will have met and conferred regarding the

24 claim terms they believe required construction and will have

25 generated a list of the terms that they collectively believe

require construction by the Court.

April 17th, parties will have served each other with their proposed construction of each claim term identified in the list.  And the original contemplated briefing was to start on May 6th.

Now, there were numerous discussions pursuant to this order in connection with this matter, and until May 1st, there was no suggestion of any kind or nature that any of these additional claims would be presented.  In fact, the plaintiff's counsel -- now, there was a different plaintiff's counsel then.  A lot of this may have been generated by a change in counsel, but plaintiff's counsel made it plain that he had selected the claims that he wanted to introduce on the grounds that these were simple and would allow the case to be tried with as little discovery as possible.

Now, as the Court is well aware, what we are talking about today are Web sites, and needless to say, I think it's fair to say we do not hide our Web sites.  The Court is plainly aware that under Rule 11, prior to filing our suit, the plaintiff is required to make a good faith investigation, and there is absolutely nothing as to these claims that was identified in discovery that would suggest that they should be added.

What has happened, I respectfully suggest, is that, for reasons that only the plaintiff knows, probably related

1  to a change in counsel, they just decided at the last minute

2  to add these claims.

3          Now, in order to be fair, we have asked them, what

4  did you find that would make you change your mind?  And they

5  have refused to respond.  They have absolutely stonewalled

6  us.  And we are not talking about the addition of just one

7  claim.  We are talking about the addition of 12 claims.  We

8  are talking about the addition of means plus function claims.

9  We are talking about adding one of the more complicated areas

10 of the patent law, and we are talking about adding it without

11 any articulated rationale except the apparent belief that the

12 order can be ignored and that the parties have no obligation

13 to justify not complying with the order.

14         Now, the order itself expressly provides a

15 mechanism.  It says, at the end of paragraph 15, "Nothing

16 shall preclude any party from seeking relief from this order

17 or seeking to alter the schedule or dates set forth herein

18 for good cause shown."

19         Now, there's no way to read this order, I would

20 respectfully suggest -- of course, I defer to Your Honor, but

21 the order was intended to set a schedule.  It was intended to

22 set a schedule on which the parties could rely.  It was

23 intended to set a schedule on which the parties could rely so

24 that they could get this case ready for trial within the six

25 month schedule that this Court always adheres to and which is

1    very important.  It recognized that the rocket docket

2    requires procedures, and it requires sticking to procedures.

3    It provided a mechanism where if a party wanted to amend the

4    order or do something out of schedule, they could do it.

5         They had the ability to petition the Court and say,

6    we'd like to add 12 additional claims.  Now, since we started

7    with 10, and you add 12, even I can do, it is 120 percent

8    increase in the number of claims.  It is not insignificant.

9    It is not unimportant.  And, yet, the basic position of

10   ShopNTown has been the order was entered.  It doesn't -- they

11   apparently think it doesn't apply to them.  They think they

12   have to give no explanation, and their view is we'll just

13   present it, and you're stuck with it.  Now, we have

14   vigorously opposed that.

15        THE COURT:  All right.  I think I understand.

16        MR. SHUMADINE:  I think Your Honor understands our

17   position, and I'll yield the podium.

18        MR. ALBERT:  May it please the Court, Your Honor.

19   For the record, Alan Albert for the plaintiff.  If you don't

20   mind, Your Honor, I would also like to introduce those who

21   are here.

22        THE COURT:  Okay.

23        MR. ALBERT:  My co-counsel from Proskauer Rose firm,

24   Steven Bauer, who has appeared in this court a couple of

25   times, although I think not in front of you, Your Honor --

1          THE COURT:  Okay.

2          MR. ALBERT:  -- in prior cases.  I believe he has

3     been in Judge Smith's courtroom a couple of times.  Jerry

4     Oczek, also with Proskauer Rose firm.  I'm going to turn the

5     podium over to Jeremy in just a moment to handle these

6     motions.  And Brian Wells is also with us, Your Honor, from

7     Boston.  And, of course, seated behind Brian is Bobby Crump,

8     my paralegal, who taught me how to practice law in this

9     court.

10          So if you don't mind, Your Honor, I'll turn it over

11    to Jeremy Oczek to address the motion that Mr. Shumadine

12    started with.

13          THE COURT:  Mr. Oczek.

14          MR. OCZEK:  Thank you, Your Honor.  May it please

15    the Court.

16          Your Honor, let me address a number of the things

17    that Mr. Shumadine addressed.  First of all, the claims that

18    are at issue, we simply added one independent claim.  And as

19    you'll see through the Markman presentation, and actually I

20    think it makes sense to give you some context, Your Honor, in

21    terms of seeing what the issues are, you'll see that with

22    respect to claim 21 and claim -- claim 40 is definitely in

23    the case.  No one disputes that.  The only two independent

24    claims we are talking about here are claim 21 and claim 40.

25    And you'll see in today's presentation that several of the

1  terms appear on both claims, Your Honor.  So it's not a

2  matter of multiplying the issues.  Actually, a lot of the

3  issues are very much the same.

4        And you'll also see with respect to the means plus

5  function elements that are in claim 21, I think with Your

6  Honor's direction on the means plus function element of claim

7  40, I think it will give the parties a lot of guidance as to

8  how to construe claim 21.  So in terms of the additional work

9  for the Court and for the parties, we respectfully submit it

10 is not going to be that much.

11        THE COURT:  Wait a minute now.

12        MR. OCZEK:  Sure.

13        THE COURT:  Seven of these terms the parties have

14 agreed upon with respect to claim 40, but several of these

15 terms you have not agreed upon, and then there are the

16 dependent claims that you apparently have not agreed on.  So

17 there is a difference here.  There certainly is a difference

18 when we look at these -- not claim, these terms.  You haven't

19 agreed on them.  I mean, if they are all in 40 and you have

20 agreed on them, I doubt they would be complaining, you know,

21 that they were overlapping.  But these are terms you have not

22 agreed on.  Even though you say they appear in claim 40, you

23 haven't agreed on them.

24        MR. OCZEK:  I'm sorry, Your Honor.  With respect to

25 some of the claims in claim 40, even some of the gray ones,

1    for example --

2         THE COURT:  Four of them you agreed on to overlap

3    with 40?

4         MR. OCZEK:  Correct.  And there are some, like, the

5    parties dispute substantially automated process.  That term,

6    Your Honor, appears in both claim 40 and claim 21.  Also,

7    direct access, that element or that claim term appears in

8    claim 40 and claim 21.

9         THE COURT:  I understand that.  But to the extent,

10   just because they appear, if you agree on them, it is not a

11   problem.  What they are arguing about are terms that appear

12   in claim 21, clearly you have not agreed on them in 40.  So

13   let's be clear here.  These terms you have not agreed on,

14   that are the subject of dispute in claim 21, and we can start

15   naming them if it will help any here, you have not agreed on,

16   as well as these -- as well as certain terms over in 25, 26,

17   29, 33, 29, you haven't agreed on.  So the Court counts 12

18   terms that you have not agreed on that are subject to dispute

19   on this motion.  Am I wrong about that?

20        MR. OCZEK:  You're right about that, Your Honor.  To

21   my other point, I think you'll see in today's Markman

22   presentation that a lot of the claim construction issues with

23   respect to 21 are similarly situated.  It's not a factor of

24   12, Your Honor.

25        THE COURT:  Are they different from claim 40?  Are

1  they different terms?

2       MR. OCZEK:  They are different claim elements in

3  claim 21.

4       THE COURT:  Why aren't you required, if they are

5  different terms that require to be construed to follow the

6  Court's order in terms of identification of the terms you

7  want construed, why aren't you required to follow the Court's

8  order on identifying what you want construed?

9       MR. OCZEK:  Your Honor, I respectfully submit we did

10  follow the order.  On March 11th, just as contemplated, and

11  what the order says is that ShopNTown, to make a good faith

12  effort to identify all claims it contends are infringed based

13  on information reasonably available to it at the time.

14       At that time it was before any discovery, Your

15  Honor; no initial disclosures, no interrogatories, no

16  document requests, no depositions.  At that time, based on

17  the best knowledge, prior counsel -- and, honestly, we

18  weren't involved at that point, but prior counsel identified

19  the claim 40 and some of the dependent claims as being

20  infringed.  It is actually, to correct something that

21  Mr. Shumadine said, it wasn't my firm that came in and added

22  those claims.  It was actually prior counsel recognized it.

23       Prior counsel recognized on May 1st, after the

24  parties were discussing the issues, after the parties were

25  exchanging discovery, prior counsel gave notice May 1st, and

said that he intended to add the one independent claim along

with the other dependent claims simply based on his

understanding as the discovery, the facts, the issues started

becoming more concrete, Your Honor.

So I don't think there is any allegation that the

March 11th date wasn't complied with in good faith.  And it

was.  It was just after that point, and exactly as the

scheduling order contemplates, based on information

reasonably available to it at the time, after that and well

before any claim construction briefing, so the claim

construction briefs weren't submitted to Your Honor until May

22nd.  So this is three weeks beforehand that the parties

were -- by the way, the parties during this time frame were

negotiating in good faith and trying to work together.  As

you'll see, we have come together and agreed on several

constructions to try to resolve these issues.

Then with respect to the means plus function and

adding additional stuff, I respectfully submit this week

Landmark added a means plus function for claim 48 that it

wanted construed that previously, in its opening brief, it

took the position that claim 48 had no structure in the

specification.

This week Landmark sent us an e-mail and said they

are changing their position, and now they say there is

structure with 48.  We exchanged our construction in good

1  faith and are ready to present that issue to the Court.  So

2  for the claims that are definitely in the case, Your Honor,

3  when it suits Landmark, they gave us their construction.  For

4  claim 21, when it didn't, they didn't.

5          THE COURT:  So what do you contend, and perhaps the

6  Court has gleaned it from your argument --

7          MR. OCZEK:  We --

8          THE COURT:  Wait a minute.  What do you contend is

9  your good cause for having added independent claim number 21

10  and the dependent claim on May 1st?

11          MR. OCZEK:  The good faith was prior counsel

12  learning new information about the case, having discovery

13  exchanged by both sides, and, Your Honor, I'd submit, the

14  scheduling order also orders a date for the parties to submit

15  Rule 26 disclosures.  Both parties did that.  Since then

16  we've had four supplemental disclosures from Landmark

17  identifying additional witnesses, which is normal in

18  discovery, and that is exactly what we -- that we think

19  happened here.  It was just normal discovery.

20          Quite honestly, earlier on in the case before the

21  Markman briefing, and it was simply a matter of trying to add

22  a claim that made sense along with claim 40, and I think if

23  you'll see today, Your Honor, with our Markman presentation,

24  I think if you see what the parties' arguments are with

25  respect to the means plus function of claim 40 and with Your

1  Honor's guidance on your views as the structure of claim 40,

2  I think that will influence how the parties view claim 21.

3  And so Landmark has already said if Your Honor

4  decides claim 21 is in the case, they are going to ask for

5  supplemental briefing, and I think actually if that happens,

6  Your Honor, we can work together to try to see if we can

7  reach some sort of agreement on that.  Because with Your

8  Honor's guidance on the structure for claim 40, I think that

9  will influence as to how Your Honor will view claim 21.

10  So I think if you'll see the presentation today, I

11  think you will see that these issues are -- it's an

12  incremental rather than a magnifying of the issues.

13  THE COURT:  Between May 1st and May 23rd, how much

14  discussion did you have with Landmark about these additional

15  terms?

16  MR. OCZEK:  My firm became involved in the case

17  sometime in that early May time frame.  We notified Landmark

18  that we intended, for Markman purposes, to brief these

19  issues.  We gave them our construction for claim 21.  They

20  respectfully declined to give us theirs and said that they

21  were going to be relying on the pending motion to strike.

22  THE COURT:  Okay.  Thank you.

23  MR. OCZEK:  Thank you, Your Honor.

24  THE COURT:  All right.  Mr. Shumadine, the Court has

25  one question it wants to propound to you regarding this

1    matter.  The Court noted in the record that the plaintiff did

2    provide a construction, their proposed construction for these

3    disputed terms, number 21, and Landmark, of course, having

4    objected to the identification of these additional, this

5    additional claim and dependent claims, did not respond, but

6    did Landmark in the process of working this case look at the

7    construction that they were proposing on these terms?

8            MR. SHUMADINE:  Well --

9            THE COURT:  I mean, I'm sure you've scrutinized it

10    even though you disagreed with the addition of this claim.

11            MR. SHUMADINE:  Let me answer, we certainly looked

12    at them.  We did not brief them.  A means plus functional

13    analysis is enormously complicated, enormously difficult

14    under the law of the Federal Circuit, and we had so much

15    going on in this case that we did not brief it.  We relied

16    upon our motion deliberately.  We felt we had the right to

17    rely upon it.  And if I could address one point, I still

18    haven't heard -- we've asked, and the Court asked, what

19    caused you to add this claim?  What fact did you learn?  And

20    they've said -- they've absolutely refused to do that.  There

21    is no good faith basis.

22            THE COURT:  That is not what the Court heard.  Now

23    maybe the Court needs to clear this hearing, but as the Court

24    understood it, they began to look at the discovery and to

25    look at the issues and determined that that was something

1 they needed to add based on the discovery. Now, maybe that
2 was not --
3      MR. SHUMADINE: If they would say the reason, what
4 did you learn that was not available on the Web site at the
5 time this case was filed, we would be very interested in
6 that.
7      THE COURT: We will find out. Thank you.
8      MR. SHUMADINE: But they never did, and I think we
9 have a right to rely upon the scheduling order, and at least
10 as this Court's normal practice --
11      THE COURT: The Court is very concerned about its
12 scheduling order, and the Court tries to stick with the
13 schedule. The Court has found in these patent cases, it is
14 almost impossible to run a rocket docket in a patent case.
15 Even running it at routine speeds, we are far ahead of
16 California and Delaware and a few other places, but it is
17 almost impossible to stick to these schedules we set up. So
18 we know we have some flexibility there.
19      So let me find out one other thing here and then the
20 Court is going to rule on this matter and get it on behind
21 us, all right?
22      MR. SHUMADINE: Yes, sir.
23      THE COURT: All right, Mr. Oczek. Let's get very
24 clear. Okay. I want you to answer the question
25 Mr. Shumadine just asked. What was it that became so

1   critical that you decided, okay, now we are going to go back,

2   and don't tell me it was prior counsel because I treat you as

3   one defendant, one party, no matter if you have 50 lawyers.

4   One party, they are all interconnected and responsible.  So

5   what was it that caused you to say, okay, we have to add

6   this, but it wasn't clear to you from the beginning that you

7   needed to add claim 21 in these dependent claims?

8           MR. OCZEK:  Your Honor, it was done by prior

9   counsel, but my understanding is the reason it was added,

10  Your Honor, was as the issues started coming out, as the

11  claim construction positions started being exchanged and

12  discussed by the parties, and as the issues started becoming

13  a little more vocalized, counsel realized that this was a

14  claim that was part of the case, that added just an

15  incremental part that made sense in terms of claim 40.  It

16  just seems a natural part of the case.

17          So it's based on, answer to your specific question,

18  it was based on the issues that were being discussed by the

19  parties as claim constructions that were being discussed and

20  some of the discovery that was coming out.

21          THE COURT:  Thank you.  All right, gentlemen.  Here

22  is where we stand on this.  The Court's very much cognizant

23  of what it provided in its supplemental order, and the Court

24  understands that this is not -- we can't operate with

25  scientific precision here.  The record will reflect that the

1   Court did tell the parties to get together and make a good

2   faith effort to try to identify the claims and to be clear

3   about what terms need to be construed on this case.  It

4   appears that that effort was on track until May 1st when the

5   plaintiff came up with some more terms here.

6          Although the plaintiff identified these terms on May

7   1st, it wasn't until May 23rd that the Court required the

8   construction brief to be filed.  Now, perhaps the Court could

9   have responded a lot quicker to the defendant's objection to

10  these additional -- to this additional claim, the additional

11  claims, but it did not.  But the Court does not want to

12  litigate half a loaf here.

13         If you have a dispute, we are going to resolve it

14  one way or the other and get it behind us.  That being the

15  case, the Court doesn't find this to be such an outrageous

16  and serious violation that the Court is going to strike the

17  claims.  The Court is going to permit the plaintiffs to

18  assert the claim 21 and the dependent claims.  At the same

19  time, the Court does not intend to prejudice the defendant so

20  we are going to have to have some discussion about Landmark's

21  response here.  We are not going to drag this all out, but I

22  will hear from Landmark with respect to its request to be

23  able to respond, but whatever we do, we are going to do it

24  with reasonable dispatch.

25         But that's what we are going to do.  We are going to

1    permit the claim 21, dependent claim, to be considered,

2    although it adds more work.  We are here to resolve it and

3    get it behind us once and for all.  So that is what we are

4    going to do.

5         Now, having said all of that, now what is the issue,

6    Mr. Shumadine, with respect to Landmark's, and the matter of,

7    one, to brief claim 21, brief the proposed construction that

8    the plaintiffs are offering with respect to these claims?

9         MR. SHUMADINE:  May it please the Court.  Mr. Rocci

10   said that we can brief this within a week.

11        THE COURT:  Okay.  All right.  The Court will grant

12   you leave to brief the proposed terms raised in these claims.

13   Now with respect to today, I take it that you're not prepared

14   to go forward to do anything on the claim 21 of these

15   dependent claims today; is that correct?

16        MR. SHUMADINE:  That's correct, Your Honor.

17        THE COURT:  All right.  Well, here is where the

18   situation stands.  I doubt seriously the Court is going to

19   hold a second Markman hearing on these claims.  What it boils

20   down to is the Court, you put your best foot forward in these

21   briefs because the Court is going to rely on the briefs and

22   turn around and is going to construe these terms and going to

23   rule.

24        Now, if they can brief them within a week, you will

25   have about three days to reply.  We are not going to have

 1  some extended briefing schedule here.

 2          Yes, sir.

 3          MR. BAUER:  Your Honor, Steven Bauer.  If I could

 4  suggest, that schedule is fine.  But if we hold that schedule

 5  until after the Markman argument today, all we want, Your

 6  Honor -- try and understand this -- we believe, and I suspect

 7  that they would, that there is a couple of claim terms that

 8  you'll hear argument today that really do provide a lot of

 9  guidance so that we may be able to agree on most of those

10  means plus function once we know how Your Honor rules on the

11  two that are fully briefed.

12          There are two terms that are fully briefed and ready

13  to argue today on the means plus function.  And I believe

14  that, just represent to the Court, I believe once we know how

15  you construe those two, I don't suspect that there'll be a

16  lot of disagreement.  We may still have to file the brief and

17  have you rule so that the record is there, but I think we'll

18  get there.

19          THE COURT:  Let's put it this way.  Don't expect the

20  Court to rule from the bench today on it.  If that's what you

21  want, I'm not going to guarantee that I'm going to rule from

22  the bench.

23          MR. BAUER:  I wasn't suggesting that, Your Honor.

24  The suggestion was the supplemental briefings --

25          THE COURT:  Oh, okay.

1    MR. BAUER:  -- might wait until we get your Markman

2  order because they will go hand in hand.  It was just a

3  suggestion, Your Honor, just to help you.

4    THE COURT:  The Court will take that under

5  consideration.

6    MR. BAUER:  It was just an idea.

7    THE COURT:  All right.  The Court also has before it

8  a -- where is it -- a motion to seal.  It was a proposed

9  order submitted here.  It wasn't signed by either one of the

10  parties.  Where are we on this proposed motion to seal that

11  was filed?  This motion was filed by Landmark to retain under

12  seal its unredacted memorandum of law and opposition to

13  ShopNTown's motion under the protective order.

14    MR. ALBERT:  We have no objection, Your Honor, and

15  did not oppose the motion at the time it was filed.  I will

16  be glad to endorse an order.

17    THE COURT:  Well, then here is the situation.  I

18  need the parties to -- if a proposed order is not endorsed by

19  either of the parties, you all can take it back out here.

20  Mr. Taylor, if you would take that out there to them.  It

21  hasn't also been signed by Landmark, either.

22    Now, Mr. Albert, you mentioned in your letter, and

23  without getting into the substance of it, a series of other

24  motions that we are going to, ordinary and routine matter,

25  business product could have been very quickly handled by the

1   magistrate, and I think we got our wires crossed here on some

2   things here, because a magistrate judge very quickly could

3   have taken care of the motion to quash the subpoenas, leave

4   to take additional depositions.  Those things could have been

5   handled, but what we are going to do is before the hearing is

6   over today, we are going to get a complete listing of all

7   outstanding discovery motions that we have here and see where

8   are these motions going, who is going to handle them, and to

9   the extent that maybe more appropriately should be handled by

10  this Court, I'm going to make sure we take care of them very

11  quickly.

12          I also have a motion to file a separate motion for

13  summary judgment, leave to file a separate motion for summary

14  judgment.  Here that has been filed by Landmark, and I'm

15  going to deal with that.  So I'll hear you on that motion.

16          MR. SHUMADINE:  Okay.

17          THE COURT:  The Court understands what you are

18  trying to do, Mr. Shumadine.  So you can cut right to the

19  heart of this.

20          MR. SHUMADINE:  Your Honor, we have made plain in

21  our motion, one of the most important decisions in patent law

22  that's come down in recent years is In Re:  Bilski, an en

23  banc decision from the Federal Circuit that deals with

24  business method patent claims and raises significant barriers

25  to the assertion of business method patent claims and makes

1    it plain that at law today adopts a machine or transformation

2    test in order for there to be patentability.

3         We are prepared to file a motion and a memorandum in

4    support within two days of the Court's granting us permission

5    on this.  It is a separate and independent motion, and it

6    could be case -- well, it would have been case dispositive if

7    the Court had not introduced the claim 21.  But it has the

8    substantial likelihood of eliminating all of the method

9    claims and simplifying this case dramatically.

10        As we had pointed out in the brief, it raises the

11   issue that go to the heart of the integrity of the patent

12   system.  Business method patents have been subject to

13   criticism and commentary by two justices of the Supreme Court

14   and by any number of people in the patent bar and by people

15   outside the patent bar because many of the business method

16   patents that have come before the Court have been found to be

17   wanting in terms of novelty, obviousness and things of that

18   nature.  It is an important motion.  It is a motion the Court

19   can deal with quickly, and it is a motion that we are

20   presently preparing to file.

21        The reason we've asked for permission is because we

22   do want to file a motion on invalidity at the end of

23   discovery.  We feel the prior art will show that everything

24   that this patent claims was known and done well prior to the

25   patent.  All this patent does is a glorified web-based yellow

1    pages, and everything in it is obvious, and we will

2    demonstrate that.

3            Obviously, though, Your Honor is familiar with what

4    they call, I think in this court, Judge Morgan's rule, which

5    is that if you file a motion too early, it's denied.  If you

6    file a motion too late, it's too late, and but we do feel

7    that in order to file a prior art motion, we need to have

8    more discovery.  And since we're ready to file the Bilski

9    motion, we feel the Bilski motion would be of assistance to

10   the Court.  It deals with an important public issue that,

11   with all due respect, I feel the Court ought to deal,

12   especially in a patent of this nature which we do not think

13   will stand the Bilski test.

14           And we think if a patent simply does not stand the

15   Bilski test, if it is not patentable, it is important for

16   courts to make that declaration as soon as possible, and we

17   see no downside to it.  If the Court denies it, the Court

18   denies it.  But we think that it's important.  The only

19   reason we can't file it is that under Rule 56, we get one --

20   and you're aware of that, and I don't want to waive my right

21   to file a prior art summary judgment motion.

22           Thank you, Your Honor.

23           MR. ALBERT:  Mr. Bauer will address this, Your

24   Honor.

25           THE COURT:  Mr. Bauer.  You don't think it's

1 important, do you?

2          MR. BAUER:  I'm sorry?

3          THE COURT:  It will be amazing if you agreed on

4 something.  Go ahead.

5          MR. BAUER:  This is a motion that I think is totally

6 at your deference.  It is your own personal procedures and

7 how they interact.  When this motion was filed sometime ago,

8 it looked like piecemeal motion practice, but at this point

9 we are here today at the Markman hearing.  I believe you need

10 a Markman construction to do the Bilski issue because the

11 question is what are the claims and are the claims more than

12 just -- are they patentable subject matter?

13          So I think the issue really all comes down to what

14 their claims say, and I do believe you need a claim

15 construction first.  Also, as counsel concedes, this is not a

16 dispositive motion.  But we are now at the middle of July,

17 and with, you know, two months left in the whole process, at

18 this point it doesn't look like piecemeal litigation as much

19 as it did when they first filed their motion.  So I think we

20 just defer to Your Honor whether you want one motion now or

21 both motions two weeks or three weeks from now because

22 discovery ends at the end of July or the middle of August for

23 them.  I think it is a staggered thing.  But I think that we

24 are close enough that they are going to all come together.  I

25 do believe we need the claim construction.  I think you will

1    see that in any Bilski decision.  And as an opposition, it is

2    an opposition on the record but it is Your Honor -- it is a

3    matter of your scheduling.

4         THE COURT:  All right.  Mr. Shumadine, the Court

5    certainly understands exactly what you are pursuing here, and

6    of course it is not going to be case dispositive, and

7    certainly would be up to reduce probably some of the issues

8    in the case, but I think that certainly it's more helpful to

9    the Court in the process, and certainly in any patent case,

10   if you have your claim construction behind you, and then you

11   can more clearly see what the feel is, if the claim

12   construction has been done.  And so what the Court would

13   suggest is this.

14        Now, the Court was going to suggest to the parties

15   at any rate that if you're going to file a motion for summary

16   judgment, the Court will be looking forward to them after we

17   did the claim construction, in any event.  But I think that

18   perhaps it would be more helpful to the Court if we did that,

19   filed that motion after the claims construction.

20        The Court has to do the claim construction.  It is

21   on top of the Court.  We are going to try to see if we can

22   get it done pretty quickly here.  So the Court would grant

23   you leave certainly to do it after the claim construction.

24   It may be at the point then where you are able to -- you

25   might be so close you may be able to roll it into one motion

1  for summary judgment, to be candid with you.  But the Court

2  is not saying it will not permit you to separate out any

3  separate motion for summary judgment.

4         What the Court is saying, from the standpoint of

5  timing, the Court would simply have you file it after the

6  claim construction.  And if you file it after the claim

7  construction, that is the only issue you raise, the Court

8  certainly will make an exception to its rule that you only

9  file one motion for summary judgment, you know, because I

10  think the Court has plenty of work to do here in this case.

11         All right.  I think that's it.  We will get a ruling

12  on the rest of these motions -- most of them are discovery in

13  nature -- by the end of this case.

14         MR. SHUMADINE:  Your Honor, there is one other

15  motion you might want to deal with.

16         THE COURT:  What is that?

17         MR. SHUMADINE:  That is the 38 Web site.  That is a

18  very important substantive issue.

19         THE COURT:  Okay.  Who raised that motion?

20         MR. ALBERT:  I think it is actually the subject of

21  cross-motions, Your Honor.  There is a motion from Landmark

22  to, in essence, to limit the case, seeking a limiting

23  interpretation of the scope of the complaint, and there's a

24  cross-motion from our side.

25         I believe Mr. Oczek is ready to discuss it, to

1    address those motions.  I'm sorry.  I'm just looking for the

2    docket numbers.

3              THE COURT:  That is what I'm trying to find.

4              MR. ALBERT:  The two motions for docket, the initial

5    motions were 54 and 56, Your Honor.  I've also got the

6    references to the --

7              THE COURT:  Oh, I know what happened here,

8    gentlemen.

9              MR. ALBERT:  There is a motion to quash, as well, so

10   there is three motions.

11             THE COURT:  Mr. Shumadine, the reason the Court

12   hasn't focused very sharply on that motion, because our

13   initial reaction was that I was going to refer those motions

14   to the magistrate judge on those motions because the Court

15   kind of looked at them in the initial stage in terms of there

16   being more following the discovery nature than being

17   something substantively the Court was going to deal with.

18             So what it boils down to, in a nutshell, I can hear

19   your argument here on these motions, and then I would simply

20   have to -- I don't know whether I'm going to be able to rule

21   right this minute on these motions or not because I wasn't

22   prepared to rule, but I'll certainly listen to your argument

23   on it.

24             MR. SHUMADINE:  Okay.  I do think this is an

25   enormously important motion in terms of the scope of this

1    case, and if the motion is not granted, it changes the case

2    dramatically.  We have heard, and we heard, at the judicial

3    conference of the importance of pleading, and one of the

4    lecturers there talked about the Iqbal case as being a

5    continuation of the ruling established by the Court in Bell

6    Atlanta v. Twombley, that you had to plead, you had a right

7    to rely upon the pleadings, and that what was in the

8    pleadings was what was in the case.

9         Here we have a pleading that identified a single Web

10   site, ForRent.com, as the only Web site that was being

11   accused of patent infringement.  There was no suggestion of

12   any kind that there were any other Web sites.

13        Now, Landmark has a number of Web sites, since it is

14   Landmark Media Enterprises, LLC, but the one thing about Web

15   sites is they are easily seen on the web.  We do not hide the

16   Web site.  They are easily available, and their functionality

17   can be seen simply by going to the web.

18        Each of these Web sites involves an entirely

19   different product often designed by entirely different

20   people.  In fact, some of the Web sites have been purchased

21   by others.  In fact, Your Honor, I've made an investigation,

22   and I found that if patent claims are allowed against all of

23   these Web sites, seven of the Web sites would be governed by

24   indemnity agreements in which the seller would be obligated

25   to assume the liability and would have to be given the right

to defend.

And so seven of these 38s, we know for a certainty that we have indemnification rights, and if they are added to this case, we would have the obligation to notify the seller, give the seller the opportunity to come in to defend, because the seller who developed the Web site and sold it to us would be the one liable and obligated since the seller, in selling the Web sites, that he has a right to use the patent.

There are about 10 or 12 where we can't tell whether we have to give -- whether they are still liable or not.  We would certainly give notice, but there may well be a dispute as to the terms of the liability.  So adding 38 Web sites is a major change in this case, and it is absolutely true that the only Web site that was pled was ForRent.com.  The only Web site discussed in initial disclosures was ForRent.com. And the only one for which a response was given in discovery, as we pointed out in our brief, was ForRent.com, until suddenly we have an allegation that all 38 identified Web sites are now involved in this case.

Now, if I could just pause for a moment, each of these Web sites, while they are Web sites, they are each different.  I frankly don't think you could discuss a Web site in the context of a patent infringement claim in under an hour.  If you can, you're better than I am.  And if you add 38 Web sites to this case, if it takes an hour to discuss

1    it, you've added at least five trial days, full trial days

2    and more.  And, frankly, I think in view of the issues that

3    would be raised, and especially where you would -- in many

4    cases, you would pick up entirely different developers.  Some

5    of these Web sites have not been developed by the seller, but

6    they are developed by consultants, the sellers who designed

7    the Web sites.  So the sellers could use them and then were

8    purchased by Landmark.  Instead of a simple trial dealing

9    with one Web site, we would have 38 separate trials, some of

10   which would have to add entirely new counsel and all of which

11   would be enormously complicated and confusing.

12        This Court is very, very good at simplifying and

13   assisting the jury, but we would convert a case that the jury

14   could understand into a case that would be enormously

15   difficult to understand.  And there simply is no basis that I

16   can find under the current law, especially where our Supreme

17   Court in the Iqbal case is moving toward more definitiveness

18   in pleading, to say that we are going to add 38 additional

19   Web sites.

20        Now, one claim they make, and I should address it,

21   is they argue that since we filed a declaratory judgment,

22   that we did not infringe, that in some way opened up 38 Web

23   sites.  Well, as we have briefed, and as the Court is aware,

24   even under MedImmune, which broadened the declaratory

25   judgment jurisdiction, we could not bring a declaratory

1   judgment claim again involving sites that were not

2   identified.

3       We certainly did not intend to do anything other

4   than to say that ForRent.com does not infringe.  That was the

5   only issue in the case.  If there were other Web sites, I

6   would respectfully suggest it is impossible for parties to

7   have done the initial disclosures correctly and find that

8   they missed 38 entire Web sites.  And changing the case to

9   add 38 Web sites is dramatic.

10       I mean, it may add additional parties.  It certainly

11   complicates it beyond belief, and all we're asking the Court

12   to do is to say, they ought to be stuck with what they pled.

13       THE COURT:  Let me ask you something.  In terms of

14   your pleading, when you answered, you said what?  Did you say

15   none of Landmark's Web sites, pleural, infringed, not

16   Landmark's Web site www.forrent.com infringes?  You swept in

17   all of Landmark's Web sites?

18       MR. SHUMADINE:  I don't believe so.  Certainly not

19   our intent, Your Honor.

20       THE COURT:  If you opened that can of worms --

21       MR. SHUMADINE:  We certainly -- Under MedImmune, the

22   only thing that was at issue was ForRent.com.  I thought we

23   said Landmark does not infringe, that was the intent, because

24   we thought the only issue was ForRent.com.  We never raised

25   any other Web site.  We never intended to introduce any

1  evidence on any other Web site.  We never, in our initial

2  disclosures, suggested another Web site.  We did not suggest

3  any order that would go into another Web site.

4        All we thought was it was ForRent.com, and we wanted

5  a declaration that we did not infringe.  We certainty did not

6  even think about the 38 other Web sites as being involved.

7        THE COURT:  All right.

8        MR. SHUMADINE:  Maybe we could have been more

9  precise, but when we discussed the case, when we -- the other

10  Web sites are not mentioned in anything we filed.

11        THE COURT:  Okay.

12        MR. SHUMADINE:  Thank you.

13        THE COURT:  Mr. Oczek, before you get started --

14        MR. OCZEK:  Sure.

15        THE COURT:  -- before you filed this lawsuit, I

16  assume that you did as the rule required, some investigation

17  to determine what Landmark was doing, what Web site was at

18  issue in this case; is that correct?  Did you look at --

19        MR. OCZEK:  Prior counsel did its Rule 11 analysis

20  under the rules.

21        THE COURT:  To be sure about what you were suing

22  Landmark, right?

23        MR. OCZEK:  That's true.

24        THE COURT:  The logical thing, first question is,

25  ForRent.com is infringing, the first thing going off in one's

1    head is, I wonder about any others.  Did you do that kind of

2    inquiry before you filed the lawsuit?  You have to speak for

3    your client, not other counsel.

4         MR. OCZEK:  That is fine.  My understanding was that

5    there was an investigation into the Web sites.

6         THE COURT:  And you concluded that the one at issue

7    was ForRent.com, right?

8         MR. OCZEK:  That is true, Your Honor.  ForRent.com

9    is the only Web site identified by name in the complaint.

10        THE COURT:  And that's what you started this

11   lawsuit, talking about ForRent.com?

12        MR. OCZEK:  That is true, Your Honor.  The lawsuit

13   started about ForRent.com.

14        THE COURT:  Okay.  Now, what do you have to say

15   about 38 Web sites?

16        MR. OCZEK:  Let me just show Your Honor the language

17   that you are referring to.  This is exactly what you had just

18   mentioned, Your Honor.

19        THE COURT:  I'm trying to see if the Court can see

20   that far.

21        MR. OCZEK:  Should be on your monitor.  This is

22   docket 17.  This is defendant answer and counterclaim.  In

23   its counterclaim, paragraph 29, "Landmark is entitled to a

24   declaratory judgment that it has not infringed, and does not

25   infringe (directly or indirectly) any claim for the '513

 1   patent either literally or under the doctrine of
 2   equivalents."  It is asking the Court to declare that, that
 3   Landmark itself, it just appears to us, the plain reading of
 4   the language of their declaratory judgment.  And then in
 5   terms of the relief they are asking for the Court, Your
 6   Honor, below the wherefore, subsection B, they are asking
 7   this Court, Your Honor, to declare that Landmark has not
 8   infringed and does not infringe the '513 patent.
 9        THE COURT:  But that is the understanding because
10   the lawsuit was about whether they were infringing the
11   ForRent.com Web site.
12        MR. OCZEK:  That is what they said in their
13   pleadings, Your Honor.
14        THE COURT:  So you are construing this to mean that
15   Landmark is trying to get a global articulation that they
16   don't infringe on any Web site when the whole lawsuit is
17   about the ForRent.com?
18        MR. OCZEK:  We were just reading the plain language
19   of what their counterclaim was saying.
20        THE COURT:  The Court understands it, but it is not
21   as widespread as the Court thought it was.  I mean, it is a
22   typical response that they do not infringe, has not infringed
23   the '513 patent, because you said they infringed the '513
24   patent with the ForRent.com.  You weren't talking about 38
25   other Web sites.  You were talking about one Web site.

1          All right.  I understand.

2          MR. OCZEK:  Let me just briefly, Your Honor, just

3     add a couple of points.

4          THE COURT:  Okay.

5          MR. OCZEK:  First, on the indemnity, that is the

6     first we have heard from Landmark on that whole issue, so we

7     don't even know how to respond to that.  But I will say in

8     terms of when we identified this discovery, it was in May,

9     May 22nd.  It was after we had discovery on For Rent.  We've

10    tried to keep the discovery focused, Your Honor, and narrow,

11    and at least in the pleadings, there hasn't been any response

12    saying that otherwise.  We said that in our reply brief

13    saying there has been no response to our saying that it is

14    narrow and focused.

15         And with respect to ForRent.com, Your Honor, if Your

16    Honor's belief is that the complaint only identifies

17    ForRent.com, there is a little more to the story than that.

18    So within the ForRent.com umbrella, there are at least three

19    other Web sites that are on Landmark's Web site.  They call

20    them divisions of ForRent.com.

21         THE COURT:  Well, that is different.

22         MR. OCZEK:  I took the deposition Friday, and the

23    witness confirmed that those three other Web sites, and they

24    are ParaRentar.com, SeniorOutlook.com and

25    CorporateHousing.com, that they are within the For Rent

1    umbrella.

2          So at least, at a minimum, if Your Honor's view is

3    that the complaint only identifies ForRent.com, it is our

4    view that at least that umbrella of For Rent Web sites --

5          THE COURT:  That's the difference between talking

6    about what directly pertains to ForRent.com and within the

7    umbrella and talking about a totally different Web site.  The

8    Court understands the distinction.

9          MR. OCZEK:  Thank you, Your Honor.

10          THE COURT:  All right.  Okay.  Here it is in a

11    nutshell, gentlemen.  The Court's going to grant the

12    defendant's motion, and discovery in this case will be with

13    respect to alleged violations or infringement by ForRent.com

14    in its subdivisions and parts thereof, but we are not going

15    to go off and start a global inquiry to every other Web site

16    that Landmark has.  We will never end the lawsuit.  We will

17    never end any lawsuits if we operate that way.  And so that

18    is where we are going.  And so that motion is granted.  So

19    let's confine our efforts to your determination, the

20    litigation of the question of whether there is infringement

21    by the ForRent.com Web site.

22          MR. ALBERT:  Your Honor, if I might inquire, does

23    the Court want to enter a written order or --

24          THE COURT:  That is just an order from the bench.

25    You will get a one- or two-line statement.

1          MR. ALBERT:  You don't want counsel to prepare

2     anything?

3          THE COURT:  No.  I will just give you a one- or

4     two-line statement saying what the Court has ruled and that

5     will be that.

6          MR. ALBERT:  Thank you, Your Honor.

7          THE COURT:  Okay.  Now, with respect to what we

8     primarily came here for, claim construction, I think we might

9     be there.  Are we there?  At least the Court is there.  We

10    are going to talk about the claim construction here.  We will

11    start, and we are going to go till 1:00, and then we are

12    going to break and come back at 2:00, and then the most the

13    Court is going to be able to do today is 2:00 to around 10 of

14    4:00.  And hopefully you would have gotten everything you

15    want in by that time.  The Court is going to have to quit

16    about 3:50.  That hopefully will allow each party, as the

17    Court understands, an opportunity to set their view forward

18    on this matter.  Any question?

19         MR. ROCCI:  Your Honor, Steve Rocci for Landmark.

20    Good morning.

21         Your Honor, subsequent to our teleconference on

22    Thursday, in which we discussed the claim terms in issue, and

23    we had sent a letter to the Court indicating that Landmark

24    had agreed with a number of the terms that ShopNTown had

25    proposed constructions for.  Subsequent to that time, we've

1    come to agreement on another term, and we think we've come

2    closer on at least two other terms but we are not in

3    agreement.  I have a chart that I'm going to hand up to the

4    Court to show where the parties are in agreement and to show

5    where the disputes are.

6              THE COURT:  All right.  That will be fine.

7              MR. ROCCI:  I also have one for --

8              THE COURT:  Yes.  Please pass one over for my law

9    clerk so she can see where we are going also.  Claim 40.

10             All right.  So claim 40.  Tell me, before the Court

11   even looks, what was the other term that you agreed on?

12             MR. ROCCI:  The term that begins with the word

13   provide greater exposure.

14             THE COURT:  Okay.  Provide greater exposure.  That

15   is gone.

16             Just for the Court's curiosity, what was the term

17   you almost agreed on?

18             MR. BAUER:  Your Honor, I will point those out

19   during, but there is two that are pretty close.  I can start

20   with those if you'd like.

21             THE COURT:  Here is where we are.  We are down to,

22   by the Court's calculation, talking about five terms or six

23   terms in claim 40.

24             MR. BAUER:  That's about right, Your Honor.  To

25   address, I can point to page 5.  This a very focused one.

1    You can see exactly where our disagreement was that was

2    close, the very last one, claim 51, inputting the information

3    occurs in real time.  I'll either foreshadow it or we could

4    deal with it.

5          THE COURT:  Well, just state your position and

6    differences.

7          MR. BAUER:  The differences, Your Honor, we have --

8    both sides agree that being real time means substantially

9    immediately.  Both sides agree to that, but that creates --

10   real time substantially immediately, but that creates another

11   new level of how close is substantially immediately, and you

12   know experts go on forever.

13         THE COURT:  It is immediately substantial, I

14   suppose.

15         MR. BAUER:  We added a clause that comes right out

16   of the Federal Circuit, which is the last clause there, given

17   the processing limitations of the system.  What the issue

18   becomes, Your Honor, when a computer is running in real time

19   and you plug something in, how long does it take -- you know,

20   like an e-mail.  Somebody sends you an e-mail, and they tell

21   you you are going to get the answer in real time, and you do.

22   I sent you an e-mail and it pops up on your computer.  But

23   it's substantially immediately.  But how fast is that?

24         So the Federal Circuit has said it means given the

25   processing limitations of the system, that, you know, nothing

1   is substantially immediately.  It all depends on the physics

2   and the computer network and that sort of thing.  So we are

3   just trying to add that definition to give a little more --

4   well, the Federal Circuit's definition.  But I'll get to

5   that, Your Honor, if I can begin now.

6           THE COURT:  You may.

7           MR. BAUER:  So, Your Honor, we actually have the

8   PowerPoint for Your Honor.  Your Honor, how many would you

9   like?

10          THE COURT:  Two.  Give me one more.

11          MR. BAUER:  We have another copy if you'd like.

12  Your Honor, this is, what we handed to you, is the PowerPoint

13  in the order I'll be addressing these today.  Just a very

14  brief overview, just a quick technology tutorial just to walk

15  through this, 50 odd figures in this patent, and what we have

16  done is we've pulled them together just so you can see

17  exactly what is going on.

18          And then the claim construction, there are seven

19  terms that -- well, actually, the element six are the claim

20  21 ones, so I won't be addressing those today, and so that

21  really leaves six terms.  Real time is very simple, so there

22  is really four that are needy.

23          So, Your Honor, the patent was filed in 1999, issued

24  in 2005.  The claims that are asserted, we only really need

25  to focus on the independent claim 40.  Claim 48 and claim 51

1   have these little disputes, but it's mostly in here.

2           So, Your Honor, here is the field of the invention,

3   what the patent is about.  We heard counsel for the other

4   side talk about, this is all obvious, and it's just a yellow

5   book and whatever.  Well, Your Honor, this was the first

6   product, the first Internet site, going back pre-1999,

7   before, I mean, really, at the beginning of e-commerce, and

8   as the patent describes, the invention relates to a system

9   for organizing Internet information based on geographic and

10  topical categories.  And geographic and topical categories

11  are now agreed.  Those were terms that were a little bit in

12  dispute.

13          And I should back up, Your Honor.  When you read the

14  briefs, it's a little confusing now because two-thirds of the

15  terms in the briefs, as you read them, have been agreed.  If

16  you read the briefs first, you will see a lot of attack from

17  Landmark against us in terms of new counsel coming in and

18  change terms and the whole thing.  What you will see is at

19  the end, the terms that are agreed were the terms we

20  proposed.

21          So when we came in as new counsel and we tinkered

22  with the terms, I think it was a knee-jerk reaction, oh, my

23  gosh, you are changing everything, we need to stop and think

24  about it.  And that comes through in the brief.  And there is

25  a lot of footnotes; this term is different, this term is

changed. But the agreed terms are mostly the ones we proposed, more often than not. And so we didn't come in and blow the case up. And, in fact, we are now down to just a few terms.

The patent talks about the issue being how do you direct a consumer and a merchant to a specific geographic location for, well, in this case, rentals, but not necessarily rentals. It could also be anything, by hiring a electrician. Pre-1999, what you had to do is go to a search engine, and you would type in the search engine, you would say "electrician, Norfolk, Virginia." And back then, before the search engines were nearly as good as Google, this may even be pre-Google, but I don't know exactly, but before these search engines were that good, if you typed in "electrician, Norfolk, Virginia," you might get the fact, you know, some guy whose name who has his job as an electrician. It wouldn't direct you to electricians looking to do business in Norfolk, Virginia. You had these search engines that gave you lots of unnecessary information, lots of Web sites from all over the place.

And the idea here was to provide a system that allowed the merchants automatically, substantially automatically, to go to a Web site from anywhere in the country, put their information in, substantially automatically, that was a big thing at the time, and then

1    consumers could go to the Web site and key in Norfolk,

2    Virginia, and find the information.

3            Before this patent, before this invention, what

4    people had to do, an electrician would have to basically call

5    the Web site and say, Can you please add this information or

6    fax something or send an e-mail saying here is information?

7    And a human at the Web site had to sit there and data entry

8    and put it in.  So the idea here is being substantially

9    automatic, it can all be done by the merchant and the

10   consumer without substantial human intervention.  It allowed

11   the merchants to target specific geographies, and it allowed

12   the customer to find things within the specific geography.

13           Now, this is where the figures come out of the

14   patent, Your Honor.  So the first page, figure two is the

15   home page.  And ShopNTown was an operated business.  This

16   isn't a patent that just came up out of nowhere.  ShopNTown.

17   So it had the home page.  And then you see, Your Honor, there

18   is two things on the side.  You type in a town name and a

19   city.  That would be called inputting information.  Or it

20   says "U.S. site map," you could select information.

21           Now, the patent disclosed both, but at the end the

22   claim is focused to selecting.  The claim isn't directed to

23   inputting the information but selecting.  And so you would

24   select the U.S. site map.  That could be done with a picture

25   of the U.S. where you click on a state, or it could be just a

tree where it says states, and then you click on the states, and it says cities, and then you click on the cities, and it has even locations, neighborhoods within the city. So that is selecting as opposed to inputting.

And what would happen is, Your Honor, you would click on the U.S. site map -- and I'm using just the figures here. So the figures don't all fit together. But you would have that national page. And when you click on the national page, it gave you the opportunity to now go to a region, an area, and the patent here has you go to Lombard, Illinois, as opposed to other places in Illinois. And when you click on that, you're now at the ShopNTown site for Lombard, Illinois.

Now, again, it's not -- although, this case is about real estate, the patent is not just about real estate. And what you would do here, Your Honor -- these are the claim elements. What we are trying to do is just sort of put the claim elements together. This is the biggest blow-up I could get.

THE COURT: That is fine.

MR. BAUER: So the preamble talks about the method for providing interactive Web site. That is what we have just seen. It is a home page. It is a method for providing an interactive Web site for referring customers to one or more merchants.

So then it's providing, allowing the merchants to

select from one topical category.  These are the elements
within these elements.  So let me just walk through what is
going on.  When the element is allowing the merchant and
consumers to select from a topical category, a topical
category, we've agreed, is a category.  We have the exact
definition in here.  It is a group of characteristics defined
by a common -- group of items defined by a common
characteristic.

In this case you've got Lombard, Illinois.  There is
the topical categories.  And if you click on a topical
category, such as home & garden, it takes you to the next
page, and then you can keep drilling down.  You can do home
improvements.  It just keeps drilling down.  In each of these
is a topical category, each item, home improvement,
contractors, electricians.  And so, Your Honor, if you see
that page there, each one of those is a topical category.  In
the real estate world, topical categories could be pet
friendly apartments, or three-bedroom apartments, or
apartments with -- each of those on the Web site would be
something that you can define and narrow down as you search.

Another claim element, that's displaying the
merchant information in response to the geographic area.  So
this is what happens.  When you click electricians, and now
you want to get some real information, you hit that button
and up comes a page -- this is page 16 -- showing a page of

electricians in Lombard, Illinois.  And you get all those
electricians' names there.

Now, how does that information get there?  And this
is where the invention comes in, the fact that that
information is substantially automated is the invention, if
there were Web sites out there that you could go and find a
list of electricians, but it was all human input.

So here on page 17, this is what's called the
account manager, and the account manager is really the big
part of this invention.  The account manager allows you, as
you see in the middle column there, it allows you to, it says
you have selected to post in these communities.  This is all
done online.  The consumer can go -- not the consumer, the
merchant can go on the account manager, and all done by Web
site from wherever in the country he or she wants to be, and
pick communities, that's the middle column, or the right
column, select the categories.

And so the merchant can go and click and say I want
to be in Lombard, Illinois, and I want to be an electrician,
and clicks those buttons, and it all gets automatically done.

Page 18, there is a claim on the page that the
merchant has direct access to modify.  It is not just putting
the information in, which is a first step, but the ability to
then come back later and again, through this substantially
automated process, modify, add, or remove the information.

1   And that, again, is done through the account manager on page

2   18 where they can click and go through a bunch of these

3   things.  And then the last button on the bottom, on the

4   bottom corner of page 18, it says reset, and if they click

5   reset, that's modifying, adding or removing the information.

6         Page 19 is just to give Your Honor -- there is more

7   to this than just a Web site.  This isn't a patent that just

8   describes a Web site.  This patent gets into the algorithms

9   of how it's done, and that is why there is so many figures.

10  There is a lot of beef in this patent.  So page 19 is the

11  algorithm and algorithm for the account manager.  This is

12  figure 19 of the patent.  And the reason I mention figure 19,

13  figure 19 is an alternative.

14        So this patent, when I say a lot of beef, it is just

15  not simply saying here is one way to do it, they talk about

16  at least two different figures, and this is the account

17  manager.  And the PowerPoint doesn't give you both, but in

18  the patent, figure 19 and figure 19-A are described as

19  alternative embodiments for how this account manager

20  operates.

21        Slide 20, monitoring the information, these are two

22  different elements within the claim but they talk about

23  monitoring information and providing statistics, and you get

24  that by hitting the statistics button.  Slide 21 provides an

25  algorithm of the kinds of things, how you get those

1  statistics, displaying community traffic count, job activity,

2  display banner ads, that sort of thing.

3        And then the last element in the claim, on page 22,

4  generating revenue -- that is what it is all about -- an

5  element of the claim, generate revenue based on the

6  information that is input.  You'll see in the bottom right

7  corner where there is a calculation of fees and things like

8  that.  So that is how the Web site works, Your Honor.  That

9  is just an overview, and I hope that helps putting all the

10  slides together so you can see what is actually going on.

11  Substantially automated for consumers of end merchants, both,

12  accessing through the Web site.  These are the key steps, key

13  elements of this thing.  Substantially automated through the

14  Internet, and it allows this all to be done quickly and

15  efficiently.

16        Slide 23, there are two other elements in the claim.

17  Most of the claim's talking about the Web sites.  But to give

18  the patent some structure, and this is where we talk about

19  Bilski and things like that.  It is not just a Web site but

20  there is structure to this patent.  This patent operates on a

21  computer network, on the Internet.  And so there is two

22  elements, connecting the consumer to the one or more pages,

23  and providing means for the consumer.  So there is a

24  connecting the consumer to the one or more pages is one

25  element, and providing means for the merchants to connect to

1  the webpage.  So those elements are intended to give us some

2  physical structure because everything else is all the

3  webpage.

4        Page 23, Your Honor, shows that this patent gives

5  physical structure.  The patent talks about an Internet site

6  64, which includes webpages and a file server, a specialized

7  computer, and I point out file server is a specialized

8  computer because I think you'll see in Landmark's brief, they

9  talk about the patent only describes a general computer.  It

10  doesn't.  It's talking about a server, and, in fact, very

11  specifically -- I'm sorry.  This isn't the one.  There is

12  another page.  Here it is talking about the files being HTML,

13  that this is an Internet.

14        Figure 54, I bring this up, Your Honor, because this

15  is what they want to describe as the connecting means, the

16  whole figure 54.  This is the one means limitation that we

17  get to when we get to the detailed claim element.  And

18  Landmark would have the Court believe that the patent

19  describes figure 54 as a simplified schematic diagram of the

20  general structure of the Internet.  54 is the first, although

21  it is figure 54, it's described in the first few paragraphs

22  of the invention.  It is the background.  It is saying here

23  is how the Internet works, and then we are going to get into

24  the Web site.

25        The claim is a method for providing a Web site.

1    That's the preamble.  The field of the invention is a method

2    for providing a Web site.  Figure 54 shows the Internet site

3    at element 64.  That's the invention.  And that's where all

4    the claim construction should be directed.  And the fact that

5    figure 54 shows the Internet site connected to the Internet

6    doesn't mean that the company has to provide the Internet

7    infrastructure.  They would have that providing means to

8    suggest just that if I say providing a way to get from

9    Norfolk to Washington, I'd have to build the interstate

10    highway or lay the railroad.  And, Your Honor, I think this

11    claim is, when I say providing a way for you to get to

12    Norfolk to Virginia, renting you the car is probably enough.

13    And, yeah, semantically you can say, sure, it includes the

14    interstates and the highways and the airports, but you've got

15    to focus on what the invention is here.

16        All we have done here, Your Honor, is take that

17    figure 54 and just show you a lot of boxes.  This is on page

18    25.  The Internet site, this is what the invention is, 64.  A

19    bunch of this is the Internet.  And then off on the side you

20    see where the merchants and the customers are.

21        I will say the patent, we label these merchants and

22    customers.  The patent says they can be anything, but I just

23    labeled those merchants and customers just so Your Honor can

24    see how they connect to the Internet.  But since everybody is

25    connecting through the Internet, there is nothing that

1    requires any one of those to be a customer or a merchant.

2         Slide 26 gets to the computers, but that is how the

3    hardware is done.  The system -- this is in the patent,

4    column 11:  The system can be run on servers such as GTE's

5    backbone having 2-4 Sun Servers with the UNIX operating

6    system and Oracle Server and Oracle Database server.  This is

7    giving you all the information, all the information anybody

8    in this field would need to know how to run a Web site.  This

9    is how people run Web sites.  There is no pie-in-the-sky

10   science fiction here.  This is real hardware, real

11   infrastructure, real detail.

12        And, Your Honor, that's the background.  I can now

13   get into the first claim.

14        THE COURT:  All right.

15        MR. BAUER:  Or close enough to 1:00.

16        THE COURT:  You have four minutes to 1:00.  Let's

17   not start the first claim.  Let's come at 2:00.  We will

18   start the first claim.  We are going to move with dispatch

19   due to claim stance.

20        All right.  The Court will be in recess until 1:00.

21        (Luncheon recess from 12:54 p.m. to 2:03 p.m.)

22        THE COURT:  Okay.

23        MR. BAUER:  Thank you, Your Honor.

24        All right.  We are on slide 27.  The first few

25   slides, Your Honor, not knowing how we are going to go, these

1    are the agreed upon terms.  So we can just go through the
2    next few very quick.  I don't think we need to spend any
3    time, but you have them in your package so they are all
4    convenient, particularly with the hierarchy of geographic
5    areas that we talked about, the geography and tiers.  To
6    select from we agreed means to choose or pick from.  Topical
7    categories are the groupings of defined items.  Localized
8    geographic area is a specific.  These are the ones that we
9    all agreed upon.

10            So what we've got are the seven here that I
11   mentioned earlier.  I don't need to talk about six at all.
12   Seven will be very fast, as will number three.

13            So let me start off with, the basic premise in any
14   claim construction hearing is the interpretation to be given
15   terms has to come from the invention.  You can't look at
16   things in a vacuum.  You are looking at the claim language,
17   the words.  We start with the ordinary meaning.  Do they have
18   an ordinary meaning?  If they don't, then we may need to go
19   to the next level, but we need to understand the invention.
20   That is why I took a few minutes, 10 minutes, 15 minutes to
21   put it all in context.

22            And clearly the Phillips case, which is the lead
23   Federal Circuit case, the words get their ordinary meanings
24   unless -- it is important, Your Honor, because the terms we
25   are talking about, as we look at them, are all ordinary

1    English words.  These aren't special engineering words.  That

2    is why there are no witnesses coming today to talk about

3    those of ordinary skill.  This is just high school English,

4    maybe, but lawyers can argue about every word, especially

5    when a dictionary has five different definitions for the

6    word.

7             The first issue is allow that I'd like to address.

8    This is on page 3 of the chart that Mr. Rocci handed up.  The

9    word "allowing," if you look on slide 37, actually shows up

10   four times in the claim, the word "allow" or "allowing."

11   Only two of them --

12             THE COURT:  Excuse me one second.

13             MR. BAUER:  Would you like another copy?

14             THE COURT:  Go on.

15             MR. BAUER:  We have --

16             THE COURT:  Sure.

17             MR. BAUER:  This is on slide 37.  It is claim 40.

18   And Your Honor will see the word "allows" or "allowing"

19   appears four times.  We didn't think that there would be an

20   issue with "allows," but Landmark has asked for construction

21   of two of the four terms.  So we only need to address the

22   middle two, the allowing one or more merchants and the

23   allowing -- well, both allowing one or more merchants to

24   select one of the localized areas and allowing one or more

25   merchants to input information.  The other two "allows" and

1  "allowing," nobody's asked for construction, but I think the

2  word has to have the same meaning in all four places, so

3  we've got it in two places that there is a construction

4  issue.

5          We believe, Your Honor, that -- and here is where

6  the dispute comes down.  This claim chart 38, here is what

7  allows means, we say, the English word, allowing, permitting.

8  Permit something.  It allows something.  The Web site

9  permits.  The claim language, it permits one or more

10  merchants to select the topographical categories in the

11  geographic areas.  The claim -- the Web site is designed to

12  permit that, to allow that.  That's what the patent shows,

13  that's what I showed you in the tutorial, and that's what the

14  word "allows" means.

15          Where the dispute comes down is that Landmark is

16  asking that the claim require that the merchants actually

17  pick or that the merchants actually create and post.  And,

18  Your Honor, the issue isn't purely semantics in that regard.

19  What "allows" means, permitting, ordinary English word, but

20  what Landmark's change intends to do, and this is on slide

21  39, they seek to shift the required action, that activity,

22  from the Web site to the merchant.  And that's a big issue,

23  because, Your Honor, the Federal Circuit has said the claim,

24  all the steps of the claim need to be performed by a single

25  actor.  This is the MuniAuction case from the Federal

1  Circuit.  And the claim needs to be written from the

2  viewpoint of a single actor so that if a separate actor has

3  to do something, he may not have infringement.  It all has to

4  be one person has to do all the steps.

5       Well, the claim is written in that sense.  The claim

6  is written to allow that the Web site is the actor.  The

7  person who owns the Web site is the actor, the accused.  So

8  that the claim language itself is allowing the Web site,

9  allowing -- who's doing the allowing?  The Web site allows

10 the merchants to select the Web site's design.

11      If you look at their language, they're requiring the

12 merchants to be picking the localized geographic area or the

13 merchants to be inputting the information.  So as soon as you

14 look at they're language, it takes the element away from the

15 Web site, requires the merchants to do something -- merchants

16 are people they don't control -- and they are going to now

17 come in and say, oh, everybody's not doing the same step,

18 there is not one entity, legal entity doing.  That is why the

19 term is so important.

20      So it's not just a question of is it permitting or

21 allowing.  Now, what does allowing mean?  The dictionaries,

22 we cited three different dictionaries:  The Oxford English,

23 Merriam-Webster's, allow means to permit.  Encarta World

24 English Dictionary, to let somebody do something, all

25 ordinary words.

Slide 42, the Federal Circuit has -- I strike that,
I take that back, not the Federal Circuit, other courts have
looked at the word "allow."  I don't think anybody cited a
Federal Circuit case that talks about allow, but we have two
other courts that have talked about allow.  In Texas court
term, allows means to let do or happen, to permit.
California, the term allows means to permit.  And the
argument couldn't be really, Your Honor, any more simple than
that.

You'll see how quickly I'm moving today.  We have in
dispute the word allows.  We think the dictionary means
permit.  The courts have said, when they've looked at it,
permits.  There is no file history argument made here that it
means anything else.  They're not pointing to any arguments
of the patent office.  They are not pointing to anything in
the patent itself to suggest we meant something different.

All they're doing is trying to convert language
directed at the Web site as the actor, to language making the
merchant the actor and therefore taking it out from a single
actor patent claim.

There is also the -- when you see the issue, Your
Honor, is on page 38 where you see their language, there is
nothing that requires the merchant to actually pick in the
claim.  The claim says allowing the merchants to pick.  Now,
it may be a damages issue, how many merchants do the picking,

1    and they talk about that a little bit in their brief about

2    how not everybody picks the -- not everybody goes to their

3    Web site does it.  Well, that might be a damages issue but

4    it's not a claim construction issue.  And the thing about

5    creating and posting, the question is who's doing the

6    creating, who's doing the posting?

7            THE COURT:  One question here.  On this allowing the

8    one or more merchants to input information into the system,

9    you did define allow as permitting one or more merchants to

10   input information into the system.  Then you tacked on

11   whether or not such merchants utilize such capability.

12           MR. BAUER:  Your Honor, you can take that out if it

13   makes it easier.  I mean, that's --

14           THE COURT:  I just raised it because when you are

15   talking about interpreting the claim using the plain,

16   ordinary meaning, understanding what it says, nothing in that

17   claim, specification that, in the Court's view, raises the

18   question about whether or not the merchant seeks to utilize

19   those capabilities.

20           MR. BAUER:  Your Honor, that was put in to clarify,

21   to define the issue between what the two parties were doing.

22   You could take that element out and I don't think it changes

23   the substance of that element at all.  It was just, you know,

24   the way these claim constructions go, both sides are

25   proposing, and they're trying to fine tune the issue.

1          What we have been able to do, I think, well because

2     one point -- when you define things, you know, even

3     dictionaries don't use the exact same words.  What we were

4     able to do is narrow it down, and you're right, Your Honor,

5     if we had one more day, I probably would say just take it out

6     and present the issue very succinctly.  And succinctly is

7     that just to define the issue, but I don't think it changes

8     the substance.

9          All right.  So, Your Honor, that was the issue for

10    allowing.  The next one is the substantially automated

11    process, and that's in claim 40.  It's also in claim 21 but

12    I'm not going to be addressing claim 21 today but you'll just

13    see it there.  But in claim 40, we talk about allowing one or

14    more merchants to input information into the system through a

15    substantially automated process.

16         Here's the two constructions.  We did modify it a

17    tiny bit from the brief, Your Honor.  We told Landmark our

18    original construction had a process that substantially or

19    largely.  We saw in Landmark's brief they pointed out, they

20    say that is sort of redundant and circular because the claim

21    already says substantially.  Again, we saw that as not

22    significant.  So although the brief uses the phrase as

23    substantially largely, the chart that you have in front of

24    you doesn't have that.

25         The issue is -- if you look at their proposal, they

1    just take the word out.  It's just gone.  They just want it
2    to be a process that takes place without human interaction,
3    period, and that just guts the language, and in these claim
4    construction cases, that's why you put the word substantially
5    in, to avoid that issue where somebody says, well, I'm going
6    to have a human touch this, and now you're no longer
7    automated.  Automated is so rigid.  When you read the file
8    history on this case, you'll see that substantially was there
9    all the time.  This wasn't something that was just added as
10   an afterthought.  This was always talked about substantially.
11   Now, the patent itself provides an example, an automated
12   system.
13           But even in the patent, and I'll show you, they talk
14   about instances where there is human interaction.  So let me
15   just -- so, first, in terms of what the word substantially
16   means, the definition we propose in terms of largely, this is
17   one where the Federal Circuit, because substantially is such
18   a standard term in patent claims, to avoid precisely this
19   issue, Federal Circuit, I think we cite four cases where the
20   Federal Circuit -- and they are in the slides here, 47, 48,
21   49 and 50 -- the Federal Circuit's addressed this at least
22   four times, and substantially refers to largely but not
23   wholly.  And that's the word the Federal Circuit uses,
24   largely, and that's the word we have proposed.  Largely but
25   not necessarily wholly.  So these are the words the Federal

1  Circuit has supplied.

2        Now, Landmark says, even though the word is there,

3  and crystal clear it's there, they want to write it out of

4  their proposal.  And they give two reasons they say you

5  should write it out.  The first they say, read the preferred

6  embodiment.  They say in the embodiment, the patent describes

7  as an automatic system.

8        Well, what the patent provides, Your Honor, is an

9  object -- this is on slide 51 -- an object of the invention

10  is to provide a system where merchants can design, purchase

11  and place advertising.  It is a system that allows us to do

12  this, and by doing it this way, it eliminates the need for

13  human intervention.  But it doesn't mean -- although the

14  invention eliminates the need, it doesn't mean that you can't

15  put a human in for some other reason.  The need might not be

16  necessary, but adding a human doesn't take you out of the

17  invention -- that is why -- depending what the human does.

18  And certainly there may be an instance where they put so much

19  human activity in that it's no longer the invention.  And we

20  don't pretend that we've patented all Web sites that have

21  geographic limitations.  But that becomes a jury question by

22  adding the word "substantially."

23        Now, an important part, Your Honor, is -- well,

24  first, the Federal Circuit.  This is slide 53 -- I just --

25        THE COURT:  Wait a minute.  Let's get something

1 straight on this slide.  You quickly say slide 53, but I'm

2 following you on the book.  I don't have slide numbers.

3         MR. BAUER:  I'm sorry.  You don't have slide numbers

4 on the very bottom?

5         MR. ALBERT:  Your Honor, I think they are in the

6 very bottom right-hand corner in black.

7         THE COURT:  In black.  Let's see.

8         MR. ALBERT:  Easy to miss them, and on the monitor

9 it is hard to see the edge of the number on the monitor.

10         MR. BAUER:  It doesn't show up on the slide.  It

11 shows up on the page.

12         THE COURT:  On the page numbers.

13         MR. BAUER:  Well, it's the way the slides got

14 printed.

15         THE COURT:  I'm following you on page numbers but

16 slide numbers, I didn't have.

17         MR. BAUER:  They are the same number, Your Honor.

18 But I understand.

19         THE COURT:  Page number.

20         MR. BAUER:  I say on the slide.  It shows up on the

21 slide.  The way it was printed out, it shows up on the

22 bottom.

23         THE COURT:  So go back to slide 53.

24         MR. BAUER:  Yes, Your Honor.  On page 53.  We are

25 just quoting the Federal Circuit's Phillips case where the

1    Court makes clear you don't look at a single embodiment.  You

2    have to look at the invention and what were people thinking

3    about, and if you described it one way, it doesn't limit you.

4           But here's the key point, Your Honor, which is the

5    next page.  This patent -- and Landmark just slides right by

6    it.  This patent describes an embodiment where there could be

7    some human interaction in this automated process.  This is on

8    column 26 of the patent where it talks about an online edit

9    feature can be provided in order to block the display of

10   inappropriate pictures.  Every picture entered for

11   classified, coupons, banners or any other video, to be

12   displayed, would have to review and review the pictures --

13   the sentence isn't so clear.  But the next sentence, The

14   staff of reviewers or censors would view several pictures at

15   a time and would have the capability of passing or blocking.

16   So even this embodiment shows that.  And why that is

17   particularly important, Your Honor, although we are not here

18   to talk about infringement, the reason Landmark puts this

19   issue in play, they say in their brief, is that they intend

20   to add a level of censorship in the future.  They say it's

21   because of the Craig's List issues that came up in the last

22   six months where people were posting on Craig's List and

23   opening the opportunity for fraud.  I believe that that is a

24   reason for them to be doing it.  But what they say is because

25   they plan to do that, they know that this claim can't cover

1  them.

2         Well, that's not infringement argument.  It is not a

3  reason to take the word "substantially" out.  It may be what

4  the jury has to decide how much have they done.  But when

5  they say that the patent has to be limited to the embodiment,

6  this patent describes censorship review within the

7  substantially automated process.

8         So it is total misdirection to suggest that there is

9  only one embodiment here.  The claim has to be read that

10  narrowly, and the word in the claim needs to come out.  And

11  then, of course, the patent has the language that's usually

12  in most patents about, the invention is acceptable to other

13  embodiments.  And the patentee here reserved that right both

14  in column 10 and in column 27.

15         But the fact is the word is there in the claim and

16  you can't just take it out.  It would be one thing if the

17  word wasn't there and we were trying to add the word back in

18  based on embodiment, but the language is there, and this is

19  on page 56 and 55.

20         Now, the second argument that they make about

21  substantial and why they want to take it out is they say

22  there was some sort of disavowal of the word "substantial"

23  and that something took place in the patent office that would

24  lead one of ordinary skill, reading this patent, to believe

25  "substantial" should be written out, even though the word was

1   always in the claim and always argued to the patent office.

2          Now, first the Federal Circuit says to take a word

3   out based on patent office prosecution, the disavowal has to

4   be clear and unmistakable, ambiguous statements, or just

5   argument, the statement has to be clear and unmistakable.

6          They point -- this is on page 58.  They point to one

7   paragraph in the prosecution to define, to say that

8   "substantially" needs to come out, on page 58.  They point to

9   an affidavit or declaration of one of the inventors.  You

10  need to read the whole paragraph.  The paragraph says,

11  Contrary to past systems, the present invention permits the

12  user, doesn't require the user, to do it all.  It permits the

13  user to create and post its business listings using a

14  substantially automated process.  The word's there.  And a

15  feature, a feature of that invention is it doesn't have the

16  delay, without the delay of having the information reviewed

17  and posted by another human being.  The user is responsible

18  for inputting the information and other data.

19         By the way, there is that input again which we were

20  talking about the prior term where they want the term to

21  create, as the user who inputs and edits the information.

22         Now, there is no disavowal there that substantially

23  modifies automated process.  But on the same day, Your

24  Honor -- this is on page 59.  The same day that that

25  declaration, the declaration was submitted, but with lawyer

1  argument, with an office action response, and this is on page
2  59, and what they told the patent office is that the word
3  "automated" means to convert largely to automatic operation.
4  I mean, it is almost double.  I mean, they are saying
5  automated is largely.  So in terms of a clear disavowal, they
6  are telling the patent office, this is what automated means,
7  largely automatic.  Now, they went so far -- they were
8  careful -- they put the word into the claim "substantially"
9  instead of "largely."  But it is largely automatic where an
10 automation is defined as the technique of...that takes the
11 place of human organs of observation, effort and decision,
12 quoting from a dictionary there.
13        The next sentence, Accordingly, unlike the prior
14 art, the present invention does not require the information
15 to be reviewed.  It's a feature of the invention.  It's not a
16 claim construction.  It's not a definition.  It's a feature.
17 And claim construction says you don't read features into the
18 invention, into the patent.  So here the invention does not
19 require the information, and it doesn't.
20        Now, they would rewrite the claim to require -- to
21 prohibit -- that is how they would read that sentence,
22 although it says does not require the information to be
23 reviewed, it permits it.  You might not want to do it; you
24 might want to do it.  Sometimes you do it; sometimes you
25 don't.  You might need -- what we are talking about is you

1  might need somebody to go in and fix this, or as the patent

2  describes, you might need somebody to censor it or review it

3  before it's posted.  There is some level of human

4  intervention permitted, although the invention doesn't

5  require it.  They are trying to read a negative limitation

6  into this claim.  They are trying to bring back the fact that

7  it doesn't require it to say it prohibits it, and that's

8  going one step behind.

9       And then page 60, Your Honor, just some case law

10  that talks about you can't leave the claim limitation out.

11  The word's there.  It has meaning.  There is no clear

12  disavowal.  And what they are trying to do is -- clearly,

13  they told the patent office, our invention doesn't require

14  human intervention.  Clearly, they told the patent office

15  that.  But it doesn't mean -- and the patent

16  describes instances where it's permitted.  And then the

17  question is, is it largely automatic?  And that's the issue

18  on that one, Your Honor.

19       All right.  Then just like page 61, you just see

20  where it is in claim 21, as well.  Your Honor asked where

21  were the two that we were close?  The next one is one that we

22  were close, we are close.  This is the direct access to

23  modify.  And slide/page 63 shows where it is in the claim.

24  It's where the merchant has direct access to modify, add or

25  remove the information.

1    And the next slide, page 64, shows where the issue

2  is, and the issue is defined.  And let me tell you exactly

3  what's going on here, what the issue is.  The issue comes

4  into -- and this is why we were close.  There is two issues

5  in this.  They are both issues that I just argued with

6  respect to the other claim terms.  So however you define the

7  other claim terms, it's resolved here.  And we had made a

8  proposal last night that we simply put in here a sentence

9  that says, as defined by the Court above, and they didn't

10  want to do that.

11    So it's the issue of input that I mentioned earlier.

12  That was previously input.  They want to say that was

13  previously created and posted, and we've asked Your Honor to

14  define that term in one of the earlier ones.  So those go

15  hand in hand, whatever you define input means, whatever you

16  say input means, it would apply here.

17    And similarly, they want to say on the system, using

18  the automated process, and we want it to say, we propose that

19  it says on the substantially automated process, we would even

20  agree with that.  So they have taken the word "substantially"

21  out, and that's what I just asked, we just discussed the

22  element before.  So if Your Honor believes that the word

23  "substantially" belongs, then it just goes into their

24  construction.

25    So where we say input into the system, there is two

1   ways to fix it.  Use our construction where it says input
2   into the substantially automated process, would be one way,
3   take ours and say input into the substantially automated
4   process.  The others would be to take theirs and say
5   previously input on the system using the substantially
6   automated process.  But there is no independent argument, I
7   believe, on that issue.  And that also is on, in claim 21,
8   the same issue that is on page 66.
9           The next element, Your Honor, this is where I had
10  mentioned earlier we get into some means language, and the
11  next one is that introduction to the means language.  This is
12  on page 68, providing a means for the one or more merchants
13  to connect.  And the question is what is that?  Where the
14  claim is directed to a Web site, that's in the method, right.
15  If you look in the preamble, it is a method for providing a
16  Web site.  That is in the preamble.  And by the way, Your
17  Honor, if you look at that preamble, it's the same language,
18  almost the exact same language as in the claim construction.
19  The first six words, a method for providing, and then it has
20  an online Web site for referring a consumer.  And the claim
21  language is providing means for the merchants to connect.
22  It's the same -- it's the question of -- the preamble was
23  saying providing a Web site, and now in the claims itself,
24  it's providing a means for the connection.
25          Now, our definition, on page 69, is the Web site.

1    By the way, this is a means plus function limitation.  It

2    needs two definitions.  What is the function and what is the

3    structure?  The parties agree on the function, and that's

4    shown on page 69.  The parties agree that the function is

5    enabling merchants to access the webpages.  The disagreement

6    is what's provided to do that?  What's the structure?  And we

7    say for a Web site, the structure that permits it is the

8    server, the thing that the Web site owns that's connected to

9    the Internet.  So it's the structure is a server which hosts

10   the webpages.  It's the computer the Web site owns, which is

11   accessible to people on the Internet.

12        They, Landmark, wants it to be the entire Internet,

13   essentially, that we would have to provide the Internet under

14   that providing a means for access.  So they want it to be the

15   merchant's personal computer, the merchant, the person who's

16   accessing it, that we would have to give the computer to

17   every merchant accessing this, according to them; that it

18   would have to include the port server and the point of the

19   router, the Internet router, they say, and we think that goes

20   way too far for this claim.

21        Page 70, Your Honor, just puts it a little bit

22   graphic where we say it's providing a means for the one or

23   more merchants, we say it's the web server, that is what we

24   are pointing to.  That is the means that lets people hook on.

25        Page 71, I'm just pointing out there the parallelism

1    of this language in the claim to the preamble.  The method

2    for providing the interactive Web site, that's the means.

3    It's the method of -- it's providing a means for referring a

4    consumer an interactive Web site.  That's the means.

5          Now, the patent gives structure, I mentioned

6    earlier, page 72.  You can see that it's about a Web site.

7    This is column 11, the Internet site 64 includes these data

8    files.  It is patented by the Web site.  Page 73 shows the

9    Web site connected to the Internet.  Page 74 shows where in

10   the patent we describe how that access takes place.

11         The system is run on servers, such as Sun Servers

12   with the UNIX operating system and Oracle Application Server

13   and the database server.  There is structure provided.

14         Now, there is one other thing I'd like to point out,

15   Your Honor, and that is that they point to a dictionary that

16   they say defines this.  This is one of their exhibits in

17   their brief.  And push this button here.  There we go.  And

18   if I can zoom in.

19         MR. ROCCI:  Which exhibit are you referring to,

20   Steve?

21         MR. BAUER:  This is your dictionary definition,

22   Webster's International Dictionary.  I'm not sure how, is

23   that coming in okay?  I don't have it.

24         THE COURT:  The Court can read it.

25         MR. BAUER:  And, Your Honor, so this dictionary,

1  this is where I talk about the different definitions for

2  provide.  In this claim, the language is provide for, provide

3  means for.  It is interesting when you look at this

4  dictionary, there is a definition for provide for.  There is

5  a separate definition.  What it says is to take precautionary

6  measures or make provisions used with, against or for.  So

7  that squiggly, provide against inflationary economy, provide

8  for.

9        And what it tells you is when you use that word

10  "for," it's make provision for.  Provide doesn't always mean

11  give.  It can mean enable or make provision for, and that

12  makes sense in the context of this claim where you're

13  providing for this.  And it, in fact, fits perfectly with the

14  structure that both sides -- not the structure -- the

15  function.  Both sides say the function is enabling merchants

16  to do this.  And once enabling and making provision for, I

17  believe, Your Honor, I would say those are probably pretty

18  close to synonymous.  Enabling a merchant to access the site,

19  enabling them to access it, or making provision for them to

20  access, I believe, are synonymous as opposed to providing all

21  the equipment, is Landmark's argument, providing means,

22  providing all the equipment from the Internet and whatever.

23        So I think both definitions, you know, providing

24  means the server.  But even their definition of, or the

25  dictionary they submitted, providing for, making provision

1  for, enabling, that all fits, and that's consistent with the

2  invention here.

3          Oh, I'm sorry.  Got to turn this back.  Okay.  And

4  then this is -- page 76 is a page that comes from Landmark's

5  brief, and I think it just sort of summarizes what they're

6  trying to accomplish here.  The claim is an interactive Web

7  site, that is element D, and they are sticking beyond -- it

8  is a claim for an online Web site, and they are sticking back

9  to router, support server, et cetera.

10         There is one last point that is important for me as

11  I address on this, Your Honor, and I'll be wrapping up very

12  quickly after this, and that is they cite to this case

13  Netcraft v. eBay, and they say that Netcraft compels the

14  entire Internet.

15         Well, you need to read -- when you start talking

16  about what does a term mean in a claim, you've got to read

17  the whole patent.  And I'm not sure if they're asking the

18  Court to now go read the Netcraft patent and try to

19  understand it.  But when you read the decision, what you find

20  is there was a critical thing there, and that is that that

21  claim in Netcraft actually required the provision of the

22  Internet.  And, in fact, it was the key invention in Netcraft

23  was providing the Internet.

24         And here's the patent -- I'm sorry.  This is the

25  claim.  And the claim says comprising the steps by a third

1    party.  All right.  So this claim requires comprising the

2    steps that a third party do the following.  That is the

3    requirement.  And what does the third party have to do?  The

4    third party had to provide the communications link through

5    equipment of the third party.  They had to provide the entire

6    communications link through its own equipment.

7         And the whole case is talking about -- here, this is

8    Federal Circuit, the District Court noted -- let's see.  What

9    am I reading?  The District Court noted that the

10   specification makes it unmistakably clear that the invention

11   requires that the third party provide Internet access to the

12   customer.  Because it was all about the Internet provider

13   doing that.  So you can't just read a quote out of their

14   brief and say, oh, maybe we have to do it.  This case really

15   doesn't apply, plus it wasn't a means plus function

16   limitation.  And that's the argument on that one, Your Honor.

17        And I've told the other side I would try to hold my

18   time so that they would have plenty of time.  Let me just

19   very briefly, this is one of the dependent claims, claim 48.

20   There are only two dependent claims we had a tiny dispute

21   about.  This is the other means claim that we mentioned that

22   Your Honor would see.

23        Claim 48 has providing means for the merchants to

24   update, and, again, the parties agree on the function.  It's

25   allowing merchants to themselves alter the information.  And,

again, the dispute is over the structure. In this one, Your

Honor, we provide -- because in this place we are talking

about what the means are. We actually provide the detail,

figure 19. We are pointing to very specific structure here

from the patent.

This relates -- it's the method of providing a means

for the merchants to amend or edit, the issue of amending or

edit. The patent describes something called the account

manager, which I had shown you before lunch. The account

manager is the thing which allows the merchant to amend or

edit, and we put that right into the limitation. So we say

it is a webpage which allows the merchant to update. As

shown by example, the account managers, shown in alternative

figures 19 and 19A. So we are pointing right to the figures.

Running on a server, and so we have that. Again, their

argument is that the entire Internet. And so it's, again,

sort of a redundant -- not a redundant, repetitive argument

for me to make. It is the same issue for Your Honor to

decide.

I can skip through page 85 and then 86, Your Honor,

is the real time which I did foreshadow this morning. Page

86 shows the difference. We both agree substantially

immediately because we both recognize there are physics in

the system. The computer needs to do things that can't

happen instantaneously. But what does substantially

1    immediately?  And God only knows how the experts -- well, I

2    know how.  Their witness said in a deposition that he

3    construed it as 15 nanoseconds?  50.  Came up with a number,

4    and we want to avoid that.

5         This is the language that comes right from the

6    Federal Circuit, Your Honor.  This came down only on May

7    22nd, so it wasn't in our first brief.  So it was between the

8    first brief and the second brief.  The Federal Circuit issued

9    a decision saying real time, and they use the language "Given

10   the processing limitations of the system."  So we said there

11   is the structure in the definition.

12        And I've used my time, Your Honor.

13        THE COURT:  Thank you.

14        MR. ROCCI:  Your Honor, I have -- well, good

15   afternoon, Your Honor.  I have two booklets here that have

16   hard copies of our presentation.

17        THE COURT:  All right.  Thank you, sir.

18        MR. ROCCI:  Just a couple of housekeeping matters,

19   Your Honor.  First of all, there were some changes that took

20   place between last night, the time printed out, and this

21   morning.  So this booklet doesn't reflect, for example, the

22   fact that we agreed on the provide greater exposure

23   limitation and things like that.  They are reflected,

24   however, in the slides that the Court will see on its

25   monitor.

1    The other thing is I'd like to point out an error on

2  page 48 of the slide deck.  There is a reference to appendix

3  page number.  It incorrectly says A266.  It should say A91.

4  And for the Court's benefit those are references to the joint

5  appendix that has been submitted by the parties.

6    Your Honor, I'd like to take one little matter out

7  of sequence, and it has to do with ShopNTown's

8  characterization of its invention, and in particular, at the

9  outset, Mr. Bauer mentioned that ShopNTown was the first Web

10 site, unlike the Web site like Google, which was a search

11 engine, where you could go and pick a geographical area and

12 then a topical category without having to encounter all the

13 problems that a Google-type search engine would encounter.

14 And I want to tell the Court that ShopNTown clearly has not

15 reviewed the prior art that Landmark has produced to it

16 because that is an incorrect statement.

17    In 1996, a company called Apartments For Rent, which

18 is owned by Landmark -- Your Honor, the easier way to do this

19 would be for me to hand up to you two copies of some

20 Apartment For Rent literature.  I'll try to put this on the

21 overhead.  There we go.

22    What this document says is that Apartments For Rent

23 online -- now, I should go back to the first page.  The first

24 page says fall 1996.  In fall 1996, there was a Web site

25 called Apartments For Rent in which a user, who went to the

1   Web site, was first asked to pick a state from a map of the

2   United States.  Thereafter, the user was asked to select a

3   city, as shown in step two, and then the user could select

4   what ShopNTown is now calling a topical category, which is

5   the number of bedrooms, the type of apartment, and what have

6   you, and then the results would be displayed to the consumer.

7          That's what ShopNTown told you at the beginning of

8   this hearing is the novelty of its invention, and, Your

9   Honor, it's wrong, and we will demonstrate, through summary

10  judgment practice, that this patent is invalid and never

11  should have issued because there is prior art, mostly prior

12  art of Landmark's own making that was not available to the

13  patent office.

14         So, Your Honor, I'd like to start with an outline.

15  Here are the topics I'll be covering.  The topics I'll be

16  covering are -- I won't spend much time at all on the '513

17  patent.  I don't disagree very much with what ShopNTown's

18  counsel had to say about it except for the characterization

19  of it being the first Web site of its kind.  And then I'll go

20  through the claim terms in dispute, and I'd like to make a

21  few more comments about the prior art not known to the patent

22  office because there is a very rich body of it.

23         Okay.  Your Honor, at the end of the day, what this

24  patent is all about, even given ShopNTown's characterization,

25  is an online version of the yellow pages.  I'd like to

analogize as to something like this.  In my office we have a

library, and in the library, on the library shelves are a

stack of yellow page books.  I go to the shelf and I say,

what area am I interested in?  I might pick the yellow books

for -- the yellow pages for Detroit.  I might pick the yellow

pages for Los Angeles.  I might pick them for Philadelphia or

Norfolk.  At that point I have made a geographical selection.

I open the yellow pages, and I scroll down and I actually

page through.  I say what category am I interested in?  And I

look at the various categories, and I find the one I'm

interested in.  It might be electrical or electricians.  And

then I look down and there are subcategories telling me

things about those electricians.  And then the electricians

are identified in that particular area.  That is what this

patent is.  It's a business method.  It's an online version

of the yellow pages.  There is nothing new about it, and

there is nothing patentable about it.

Here is what the patent tells us.  Again, I don't

disagree with very much with what ShopNTown's counsel had to

say.  There are basically two players.  There is a merchant

and a consumer, and they're communicating with a web server.

The merchant communicates with the web server to post ads.

That is the inputting of the information.  The merchant tells

the web server where he wants the ad to appear, what

geographic area.  Your Honor, we are on slide 4.

 1          Then the merchant tells the web server what
 2   particular category he wants the ad to appear under, and he
 3   pays a fee.  After that information is entered, a consumer,
 4   as shown in the bottom right-hand slide of this screen, can
 5   access the web server.  The consumer tells the web server
 6   what particular geographic area he's interested in, what
 7   category he's interested in, and then the merchant
 8   information for that area and category is brought up, just
 9   like thumbing through the yellow pages.
10          Now, we are going to come back to this because it's
11   an important part of our case, Your Honor, but this is what
12   the patent tells us about how merchants connect to the Web
13   site.  It tells us -- I will point you to a portion in the
14   specification where it is crystal clear that the
15   specification tells us that merchants connect to the Web site
16   and access webpages by using their own PC operating a web
17   browser.  Without a PC operating a web browser and a modem
18   which can communicate via the Internet, there is no way for
19   merchants to access the web server or connect to the web
20   server and access the webpages.
21          Now, Your Honor, the very first term I'm going to
22   touch on is one that is very important to Landmark.  We very
23   strongly feel that we are right about this one.  We have been
24   taken to task for relying on the intrinsic evidence when it
25   comes to the construction of this term.  But, Your Honor,

1  that is precisely what Phillips tells us to do.

2      The cases that ShopNTown has cited in support of its

3  proposition that the Court should go to the dictionary first

4  are not only wrong -- I shouldn't say wrong.  They are

5  pre-Phillips, and pre-Phillips disabused us of the notion

6  that the first stop is the dictionary.  What Phillips told us

7  is that claims are construed by those of ordinary skill in

8  the art, and then it goes on to say -- and ShopNTown's

9  counsel didn't mention this -- having read the intrinsic

10  evidence, it is the first stop, and the dictionary or any

11  other evidence is never, ever used to contradict the

12  intrinsic evidence.

13      And I am going to demonstrate to the Court, Your

14  Honor, how the intrinsic evidence in this case -- let's go

15  back, go back -- how the intrinsic evidence in this case

16  compels the construction that the term substantially

17  automated process means a process that takes place without

18  human interaction and specifically without the need for human

19  entry or reviewing staff.

20      Now, I've been taken to task, Landmark has been

21  taken to task for reading the term substantially out of the

22  claim.  I submit to the Court we are not reading it out of

23  the claim.  What we submit is that the term substantially is

24  meant to modify automated, to account for the fact that there

25  is a person -- if we go back to the slide -- there is a

1  person in the name of the merchant who is interacting with

2  the server.  That is what substantially means.  Substantially

3  automated means, yes, there is a person, but the person is a

4  merchant.  But that's the only person it can be.  An analogy

5  would be my automatic bill pay system.  I can set up my

6  automatic bill pay system to pay bills automatically.  Every

7  month I can tell it to pay my electric bill, and it will do

8  so without a person.

9          However, if I want to, I can go in and do it myself

10  by logging on to the utility Web site and instructing the

11  bill to be paid.  The first one is a fully automated process.

12  The second one would be an example of a substantially

13  automated process because I, a merchant or consumer, am

14  involved.  But there is, under the patent, never, ever anyone

15  involved at the server end.  And that is our construction.

16  No human interaction at the server end.

17          Now, Your Honor, you're going to see the slide

18  again, but this is what ShopNTown argued to the patent

19  office.  What they argue to the patent office and what they

20  are arguing to the Court now are irreconcilable.  They said

21  to the patent office, and this is a quote, distinguishing the

22  prior art, they said, the present invention does not require

23  the information to be reviewed and/or inputted by a human

24  being associated with the system operator or third party.

25          Now, ShopNTown's counsel relies heavily on the word

1    "require" as to make it sound permissive.  What the patent

2    applicant is doing here, Your Honor, is telling the patent

3    office what the invention is not.  He is distinguishing the

4    prior art.  And they cannot now go back and make the

5    invention different from something that they told the patent

6    office it is not.

7          So if we look at our proposed constructions, and

8    this is an important point because even ShopNTown at one

9    point agreed or substantially agreed, and I use that word

10   advisedly, with our construction.  As of April 27,

11   ShopNTown's construction was a process that permits without

12   third party human intervention.  That is what they said.  And

13   on May 15th, after new counsel became involved, they changed

14   their construction to the one they are advocating now.

15         So even back on April 27th, they were of the view

16   that there is no human interaction.  Our construction, on the

17   other hand, as I mentioned, takes into account the fact that

18   there can be a merchant sitting at a PC engaging in this

19   transaction.

20         So, Your Honor, I'd like to point to three specific

21   pieces of evidence to bring out the point about the correct

22   construction of substantially automated.  The first two

23   pieces of evidence are the specification and the file

24   history.  These are the intrinsic evidence.  This is the

25   evidence that Phillips mandates -- I should say Phillips and

1    the Federal Circuit's subsequent cases mandate that we look

2    to above all else to ascertain what patent claim terms mean.

3        Now, I will be the first to tell you that different

4    practitioners can read Phillips and pick different excerpts

5    for the different propositions they wish to support.  But

6    when you read Phillips in its entirety and you read its

7    progeny in its entirety, it is clear that the mandate is to

8    review the intrinsic evidence to understand what the

9    applicant gave up during prosecution and what he considered

10   at this invention.  And then I will look at some ShopNTown

11   documents that I think are contradictory to the position that

12   they take today.

13       So, Your Honor, this is basically our construction.

14   A substantially automated process is characterized through no

15   human interaction or involvement other than the merchant.

16   And because of the intrinsic evidence, it's clear that a

17   substantially automated process doesn't include any of these

18   things.  It doesn't include human interaction or involvement,

19   other than the merchant.  It doesn't include data entry

20   staff.  Doesn't include human reviewers or order takers or

21   anyone who inputs information, other than the merchant.

22   These points are brought out in the intrinsic evidence time

23   and time again.

24       In fact, in the file history and specification there

25   are 39 instances where they tell the reader and the patent

1    office that there is no human intervention or interaction

2    involved.  ShopNTown's counsel, however, did direct the Court

3    to one passing reference to where -- the Court's attention to

4    one passing reference to where a human can be involved.  That

5    is the only reference, and it is a scant passing, and I will

6    quote a case, Your Honor -- quote from an unpublished opinion

7    somewhat again advisedly.

8         This is the Federal Circuit's opinion in Purechoice

9    v. Honeywell from June 1, 2009, where the plaintiff was doing

10   exactly what ShopNTown attempts to do here, and that is to

11   point to one place in the spec that might support its broad

12   claim construction.  And the Federal Circuit said, We are

13   unconvinced that the scant appearance of meteorological

14   attributes in the hundreds of pages of patent specification

15   and prosecution history would inform a person of ordinary

16   skill in the art that this factor extends beyond what the

17   defendant argues.  I'm paraphrasing, of course.  This is at

18   page 7 of the Federal Circuit's case.

19        Our position is that that one passing reference is

20   nothing more than a passing reference, and it was given up

21   during prosecution.  It was disclaimed, and it was disclaimed

22   because the term substantially automated process was added

23   during prosecution to distinguish prior art.  And there are

24   comments made it clear that no human is involved.

25        So, Your Honor, let's walk through the patent,

1   through the intrinsic evidence.  We start with the abstract.

2   The abstract of the patent, which is the very first thing the

3   reader sees when he picks it up, tells us that this invention

4   is directed to online self-posting, design, selection,

5   updating and payment, all of these things the abstract tells

6   us are done online and by the merchant himself, self-posting.

7           Then we get into the background of the invention,

8   and the background of the invention characterized it.  It

9   says -- we are on slide 14 -- the present invention generally

10  relates to a system, and more particularly a substantially

11  automatic system which permits merchants to select for

12  themselves.  No human.

13          Again, a second object of the invention permits

14  merchants to select for themselves.  I'm at slide 15.  Slide

15  16, it is a further object of the invention to provide a

16  substantially automated system that allows certain things,

17  and then it goes on to say, without the need for employing a

18  large personnel staff by the system's owner.  No humans.

19          It goes on to another object.  Another object of the

20  invention is to provide a substantially automated system that

21  can accommodate a higher body of transactions than a system

22  using personnel staff to enter the information.  No human.

23  And yet another object tells us that merchants enter the

24  information directly and by themselves.  No human.

25          Now, we get into the summary of the invention.

1    ShopNTown's counsel pulled this passage out.  They didn't

2    underline the word "all."  In this section of the summary it

3    tells us the operations of:  Acquiring the services; ordering

4    them; payment, all of these things are all handled online,

5    without the need for a human order taker or processor.

6            ShopNTown would have you believe that's optional.

7    The applicants are telling the reader what the invention is

8    not.  Again, in the summary, it tells us that according to

9    the invention, merchants automatically list themselves,

10   therefore the need for data entry staff or human screening of

11   the information is eliminated.  Likewise, without the need

12   for a sales staff, and it goes on about the benefits that

13   come from not having the need for a sales staff.

14           Now we get into the prosecution history and here's,

15   Your Honor, where it gets really interesting because during

16   prosecution, the patent examiner repeatedly rejected these

17   claims.  And he rejected them until two things happened:

18   Number one, the claims were amended to include the fact that

19   this process is, quote, substantially automated, and also to

20   emphasize the so-called locality inherent aspects which

21   are -- you can search by local geographic area as opposed to

22   searching a large area.  I'm going to focus on the automated

23   part because that's the part that's important here.

24           The examiner would not allow these claims until

25   there was an amendment saying this is substantially

1  automated, and even that wasn't enough.  After the applicants

2  made the amendment, here is how they characterized the

3  invention.  They said merchants automatically listing

4  themselves reduces -- excuse me, simplifies the process and

5  reduces the overall cost.  Merchants listing themselves.

6          Later on in the file history, again, arguing

7  patentability over the prior art, he characterizes the

8  invention as saying merchants may access the system to input

9  and post information using this substantially automated

10  process, and then he goes on and modifies that statement by

11  saying allowing the merchants to list themselves.  So he's

12  modifying what he said there.  It's clear that the merchants

13  are acting without a human at the other end.

14          This is the slide I started off with.  This slide, I

15  think, is devastating.  This is where the patent applicant

16  said to the patent examiner, unlike the prior art, he's

17  telling the examiner what the invention is not.  The present

18  invention does not require the information to be reviewed or

19  inputted by a human being associated with the system

20  operator, that would be the Web site, or a third party, such

21  as a third party agent.  Going on to slide 24 now.  And then

22  he goes on and he tells the patent examiner that the

23  invention solved these problems by allowing the merchant to

24  place its information on the system.

25          Going to slide 25.  He is again telling us what the

1    invention is not.  Because of the problems associated with,

2    and he's characterizing the prior art in that section, he

3    says, allowing merchants and other users to input their

4    information without human interaction and review, because of

5    that, none of the prior art references teach a method or

6    system that allows for a substantially automated creation and

7    posting of information.  Again, telling us what the

8    information -- what the invention is not, how it is different

9    from the prior art.

10           And I need to point out here, Your Honor, because we

11   are going to talk about this again, there is a

12   characterization of the information here in the section that

13   begins with, none of the prior art references teach a system

14   or method, it says, that allows for the substantially

15   automated creation and posting, and that's important because

16   they characterize this idea of putting information on the Web

17   site as being automated creation and posting.  The merchant

18   goes to the Web site, and at the Web site he creates and

19   posts information.  That's what's happening when information

20   is input.

21           All right.  On slide 26, now ShopNTown's counsel

22   told you, it got to the point during prosecution where the

23   examiner had dug in his heels, and one of the inventors,

24   Robert Deeds, submitted a declaration in support of the

25   patentability of the invention.  And in his declaration he

1    told the examiner why in his opinion this invention were not

2    open and obvious over the prior art, and in doing so he

3    focused exclusively on the substantially automated aspect of

4    the invention.

5              And what he told the examiner here -- well, let's

6    first turn to the attorney argument.  This is the attorney

7    argument.  The attorney is telling us, as Mr. Deeds says,

8    conventional wisdom at the time of the invention, and even

9    today, was to have users submit the information and

10   advertising to employees or agents of...who thereafter

11   reviewed the material...otherwise, the system operator had no

12   control.  So he's telling us why the prior art is bad, and

13   what the invention is not.  It is not this prior art aspect.

14             Now we come to the actual declaration of Mr. Deeds

15   on page 27.  And Mr. Deeds is telling us, in this paragraph

16   7, he's telling us what the common practice was in his view.

17   Of course, he didn't know about Apartments For Rent or any of

18   the other prior art that we are going to bring to the Court's

19   attention.  But he's going to -- he's telling the patent

20   examiner what the common practice was before the invention,

21   and he's saying there had to be humans involved.  And he's

22   saying that conventional wisdom was to keep humans involved

23   because automation is bad.

24             And he gives three reasons on page 28 why this is

25   so.  He says, first of all, having humans involved creates a

1  delay.  Second, it creates expense.  And third, it creates

2  the possibility that whoever it is that's working at the Web

3  site is going to enter the information incorrectly.  These

4  are all undesirable attributes.

5          So then he goes on and he says, now, contrary to all

6  of this -- I'm on page 29 -- he says, the present invention

7  allows the merchants to create and post listings, advertising

8  or other information onto the system using a substantially

9  automated process.

10         Now, ShopNTown quoted a passage similar to this but

11  stopped the underlining at substantially automated process.

12  The words that follow modify substantially automated process,

13  without the delay of having the information reviewed and/or

14  posted by another human being.

15         THE COURT:  Why is substantially even there at all,

16  I mean, if he didn't anticipate there was some human

17  intervention?  Why not just a system using an automated

18  process?  But the word "substantially" is there, and it has

19  been there every time you have gone through it, though what

20  you said, you made the comment about there being no human

21  intervention in the system, it has always come back to use of

22  the word "substantially" to modify an automated process.

23         MR. ROCCI:  We submit that the reason substantially

24  is in there, is if it was -- because if it was not, then the

25  claim, some other entity, may attempt to construe the claim

1  as meaning a fully automated process.  There is no human

2  involved anywhere.  We concede there is a human involved.

3  The human is in the name of the merchant or the consumer.

4  That's why substantially is in there.  Substantially means

5  it's fully automated at the server.  There is a human

6  involved, but that human is the merchant or the consumer.

7          THE COURT:  Okay.

8          MR. ROCCI:  Before I leave this slide -- so

9  Mr. Deeds, he submits, the inventor himself submits this

10  declaration saying that the invention allows all of these

11  things to happen without human review or intervention.  Now,

12  this term "substantially automated process," as I mentioned,

13  was added to try to distinguish prior art, but it wasn't

14  enough to carry the day.

15          There came a time when the examiner -- he continued

16  to reject the claims, and there came a time when the

17  applicants conducted an interview with the examiner.  Slide

18  30 reveals some of the substance from that interview.  It is

19  hard to read the writing so we've put it in the gray box.

20  And the examiner said to the applicants, after the interview,

21  an amendment will be filed bringing out the locality based

22  inherent structure of the system -- that is that local

23  geographic area material -- as well as clarify the

24  substantially automated nature for the merchant to -- we

25  couldn't make out the next word -- modify listings, et

1    cetera.

2         We will see what the examiner wanted here was a

3    recitation in the claims that not only is the information

4    input through this substantially automated process but that

5    that information can be modified directly by the consumer.

6    That is what direct access to modify means.  Our position is

7    that what is claimed here is a system where a merchant sits

8    down at his PC, he logs onto the Web site, he enters the

9    information, it appears on the Web site, and subsequently the

10   merchant can go back and log into that Web site and change

11   the information or modify it or remove it.  But it's the

12   information that he created and posted using that

13   substantially automated process that he has direct access to

14   modify.  And this, we think, is what the examiner was telling

15   the applicants during this interview.  You have to bring out

16   the fact in the claims that whatever was entered through the

17   substantially automated process can be modified but directly

18   modified by the merchant.

19        And, indeed, the claim was amended, as shown on page

20   31.  The claim was amended to bring this out, as shown in the

21   highlighting.  And particular the language that says, "...and

22   wherein the merchant has direct access to modify, add or

23   remove" at the bottom is the language that was added.  And

24   this language, we submit, as shown by the blue line on page

25   31, modifies "through a substantially automated process"

language, which in turn modifies the information that was input.  So the information is input through a substantially automated process, and it is that information that the merchant has direct access to modify, add or remove.

I'm going on to slide 32.  So now that we have the comment by prosecution counsel where he says the reason for this amendment is to "...clarify the substantially automated nature with respect to the merchant's usage of the system," that's what's -- that's what substantial means.  We have the merchant.

And then finally, we have, just to emphasize the point, that when we refer to the kind of information that's being input by the merchant when he's doing this work, it's the creation and posting of information.

Now, Your Honor, that is the end of the intrinsic evidence.  I thought it would be worthwhile to point out that as we sit here today, ShopNTown is prosecuting a continuation application, and in May they submitted an amendment, prosecution counsel, not litigation counsel, submitted an amendment again characterizing the invention, on page 34. They said merchants and users input their information without human interaction and review.  So they are still telling the patent office that, but they are telling the Court something else.

Finally, I want to turn to ShopNTown's own

1    documents.  ShopNTown operates a Web site, and they have a

2    patent notice on their Web site.  They have stated that their

3    Web site is covered by their patent, and so whatever

4    characterizations they make regarding the Web site are

5    equally important to the patent.

6            So I'd like to point out some of the things that

7    General Patent -- or, excuse me, that ShopNTown and its

8    financial backer, General Patent, have said in respect to the

9    Web site.  This is from a General Patent, GPC document,

10   GPC000182 produced to us by ShopNTown litigation counsel in

11   which -- it is a ShopNTown e-mail newsletter, and Walter

12   Rinebold, who wrote this, is the first named inventor,

13   characterized the invention as by referring to the "ease and

14   automation of every step within our system."

15           MR. BAUER:  Your Honor, I'm sorry to interrupt, but

16   this is all extrinsic evidence that is not in the record.

17   This is the first we have seen of this, and in your Markman

18   order regarded extrinsic evidence to have all been previously

19   cited.  I just want to flag, this is all stuff the first we

20   have seen they were going to make this argument is in the

21   PowerPoint today.  It is not in any of the briefing.

22           THE COURT:  Is that correct, counsel?

23           MR. ROCCI:  Beg your pardon?

24           THE COURT:  Is that correct that you have not

25   provided them this information previously?

1     MR. ROCCI:  It is not the first they have seen of it

2  because these were marked as deposition exhibits.  But

3  Mr. Bauer is correct, these are not cited in the brief.

4     THE COURT:  Well, the Court will certainly treat it

5  accordingly.

6     MR. ROCCI:  I should move on.

7     THE COURT:  I recommend we do that.

8     MR. ROCCI:  Okay.  Now, Your Honor, I think I

9  already mentioned that at the outset, the Court -- excuse me,

10  that ShopNTown had taken the position that a substantially

11  automated process is a process that permits, without third

12  party human intervention, and they changed that.  And we

13  submit that our construction is fairly closely aligned with

14  the construction that they were putting forth back in April

15  but which they changed in May.  So the fact that even their

16  original proposal said no third party human interaction, we

17  think, is very telling.

18     Now, what's the problem -- there are problems with

19  ShopNTown's construction.  First of all, it is contradictory

20  to the intrinsic evidence, and it provides no guidance as to

21  the claim's boundaries.  It doesn't tell us when you are

22  operating inside the claim or operating outside the claim.

23  It says largely without human interaction.  And they want

24  this so that they can navigate their way through the Landmark

25  various Web sites and try to make an infringement case

1   without having bounds on the claim.  And they also want it so

2   that they can try to navigate around the prior art, but

3   that's not the purpose of claim construction.  The purpose of

4   claim construction is to put bounds on the scope of the claim

5   such that a jury can understand when there's infringement and

6   when there isn't.

7           And I submit, Your Honor, we submit, that saying

8   that there is largely no human interaction doesn't tell you

9   when you infringe and when you don't; whereas, Landmark's

10  construction is very clear and says the term means without

11  human data entry staff or without human interaction at the

12  server end.

13          And, Your Honor, there is a case out of the Federal

14  Circuit, Halliburton Energy Services v. M-I, LLC, which is

15  very clearly to the point that when there is an ambiguity in

16  the claims, and it is possible to do so, the ambiguity should

17  be resolved toward the narrower construction.

18          It is a Federal Circuit case -- they cite to a

19  Federal Circuit case called Athletics Alternatives, and

20  that's where this support for this comes from.  And what they

21  said is when there is a choice between a narrow construction

22  and a broad construction, and the evidence equally favors

23  both, the notice function of 35 U.S.C. 112, paragraph 2,

24  favors the narrower construction, and that's so that the

25  public knows when they're inside the claim and when they're

1  outside the claim.

2  Okay.  Now, Your Honor, just on the direct access to

3  modify -- we are at slide 48.  Again, I'm just highlighting

4  the claim language here.  This language "direct access to

5  modify, add or remove" modifies this language substantially

6  automated process.

7  And we, again, we submit that the term substantially

8  automated process and direct access to modify reflect a

9  unitary concept, that unitary concept being that whatever it

10  is that the merchant inputted using that process at the

11  outset is the information that he has access, direct access

12  to modify, add or remove.  And the file history bears out, as

13  we show on slide 49, that we are talking about the

14  information that was created and posted by the merchant using

15  the substantially automated process.

16  I cited on page 50, Your Honor, a recent case out of

17  the Federal Circuit called Tuna Processors v. Hawaii

18  International Seafood.  The proposition for this case is very

19  simple.  It stands for the proposition that when you use the

20  word "the" in a claim, it refers back to a prior instance of

21  the word.  So in this case whatever information was posted

22  using the substantially automated process is the information

23  that the merchant has direct access to modify, add or remove,

24  and that's because the claim says the merchant is allowed to

25  input information through a substantially automated process,

1  and then it goes on to say, the merchant has direct access to

2  modify, add or remove the information.  So on page 51 I

3  summarize with respect to construction.

4       Okay.  Your Honor, the next term I would like to

5  touch on is what I call the means to connect.  This is the

6  claim limitation that recites "providing means for the one or

7  more merchants to connect to the one or more webpages."

8       Now, it is our position, Your Honor, that because

9  this is a means plus function claim, subject to Section 112,

10  paragraph 6, it is our position that when you look back to

11  the specification for the purpose of determining what the

12  corresponding structure is, there is only one conclusion, and

13  the conclusion is that the corresponding structure is the

14  merchant PC operating a web browser and communicating with

15  the web server via the Internet using the modem.  That is the

16  only construction supported by the specification.

17       A little bit of background on Section 112, paragraph

18  6, because it is one of the more complicated sections of

19  issues in patent law.  Section 112, paragraph 6 came about in

20  1954 when Congress passed the patent act that we are

21  currently operating under.  Even though it is 2009, we are

22  still operating under the 1954 act.

23       One of the things that Congress did in that section

24  of the statute was to address a Supreme Court ruling that

25  took place about eight years previously in the case of

1    Halliburton Oil v. Walker.  In Halliburton Oil v. Walker,

2    there was a process claimed for basically determining where

3    there might be oil under a rock or something like that.  And

4    it was basically a sonic process where you send signals down,

5    and you listen to the reflected signals, and you process

6    them, and you made a determination, based on the process

7    signal, about what might be under that rock.

8            And the claim recited steps such as providing,

9    sending, receiving, allowing -- didn't use allowing, but that

10   is a bad one, sending, receiving, processing.  And the

11   Supreme Court said that's an invalid claim because it would

12   cover every possible means of carrying out the function.  And

13   the patent laws don't allow us to claim every possible means

14   of carrying out a function.  We must claim things

15   specifically.  And so it invalidated the claim.

16           Well, in 1954, Congress remedied that by passing --

17   by including 35 U.S.C., Section 112, paragraph 6, in which

18   they said it's okay to claim things this way, but when you

19   do, you are limited to the structure described -- disclosed,

20   the structure disclosed in the specification for carrying out

21   the acts or function recited in the claim.

22           So in Halliburton, if it had said means for

23   receiving, the Supreme Court would have reached back into the

24   spec and said, well, what is the structure for receiving?

25   That's what we have to do in this claim element.

1          Now, the Federal Circuit has told us, in no

2     uncertain terms, that the only corresponding structure in the

3     specification is the structure that is clearly linked to the

4     means claim, to the function recited by the means claim.  It

5     can't be fuzzy.  It can't be guesswork.  It has to be clearly

6     linked.

7          And I submit that when you look into the

8     specification, you'll find only one linking, and that is, as

9     is shown on this initial chart, that it's the PC operating a

10    web browser, communicating with the web server via the

11    Internet.  And here on slide 55 is the support for that

12    notion.  This is the only place in the specification where

13    there is any discussion of connecting.

14         ShopNTown's counsel pointed you to some hardware,

15    but there was no discussion of connecting in connection with

16    that hardware.  This is where the discussion of connecting

17    takes place.  This is the paragraph at column 10, line 57

18    through column 11, line 6 that tells us how merchants

19    connect, and it's crystal clear, as shown in the red

20    highlighting, what happens.  Merchants or users use their PC,

21    operating a web browser, and they log onto the Internet.

22         Mr. Bauer used the example of a car on a highway and

23    seemed to suggest that if I have a claim on a store, and I

24    claimed it in this fashion, I somehow am claiming the highway

25    and the car.  If my claim says means for getting to the

store, obviously I need a car.  So in figure 4, we both agree that figure 54 of the patent is the figure that shows the corresponding structure.  And this is the figure that is referred to in the portion of the specification I just directed the Court's attention to.

What figure 54 shows is, on the lower right-hand corner, it shows the merchant or user PC communicating via modem over the Internet -- the Internet is the port server, the pop router and the routing hub, with the web server, which is the structure inside the dotted line.

There is nothing in this specification that says -- absolutely nothing that says that the web server connects merchants.  Anytime the word "connect" is used, it's in connection with merchants sitting at their PCs.

Now, it's, I think, illuminating to look at how -- before I go onto this, Your Honor, I'm about to refer to some information from their interrogatory responses and infringement contentions.  I don't know that that's -- if that is extrinsic evidence, it should be excluded, I'll move on.  Do you have an objection, Steve?

Okay.  What did they have to say in their brief, though?  They recently filed an opposition to the motion that you ruled on this morning, and in their motion they told the Court that invention has structure.  Look at what they told the Court.  The claim method must include specific types of

1    hardware and software, and it can only be performed using the

2    Internet, the very thing they now tell the Court is not

3    included in the claim.  And look at what they refer to.  They

4    refer to figures 1 through 56 which includes figure 54, and

5    they specifically refer to the claim limitation that recites

6    providing a means to connect.

7           Now, it may seem a difficult proposition for the

8    Court to adopt a construction that says, I am going to

9    construe this claim to mean structure that is not provided by

10   Landmark, that is, the merchant PC and the browser and the

11   modem, but the Federal Circuit has talked about these kinds

12   of claims.  The Federal Circuit has made it very clear that

13   this is, although it is a common claim practice, it doesn't

14   necessarily condone it, but it's not going to rewrite these

15   kinds of claims.

16          In BMC Resources v. Paymentech, there was a similar

17   problem.  And the Court, the Federal Circuit said, we are not

18   going to rewrite the claim so it will read only on a single

19   party.  That is the way it was drafted, and the patent

20   drafter has to live with its consequences.  As the Court

21   said, "This Court will not unilaterally restructure the claim

22   or the standards for joint infringement to remedy these

23   ill-conceived claims.  As between the patentee who had a

24   clear opportunity to negotiate broader claims but did not,

25   and the public at large, it is the patentee who must bear the

1   cost of its failure to seek protection for this foreseeable

2   alteration of its claimed structure."

3        In this case, there was competent patent counsel

4   drafting these claims.  They could have drafted them in such

5   a way that this problem doesn't exist.  They could have

6   written them as saying, for example, a web server that allows

7   merchants to access webpages, but they didn't say it that

8   way.  They said means to connect to the webpages, which takes

9   us back to the specification and therefore to the structure

10   disclosed in the specification.

11        Okay, Your Honor.  The allowing term is probably the

12   last of the terms that really require any significant

13   discussion.  Our position with respect to allowing is this.

14   This is a method claim.  Method claims cover the use of an

15   article.  It is page 64.  They cover the use of an article.

16   Only a user of the method recited in the claim can infringe

17   it.

18        ShopNTown has attempted to introduce some permissive

19   steps into the claim making it very fuzzy as to what its

20   scope is and therefore when there's infringement and when

21   there isn't.  The example I like to use is this one.  I have

22   two examples.  If I have a method claim that says something

23   like this, a method comprising the steps of providing a

24   drinking glass, that is the first step, and B, allowing the

25   drinking glass to be used as a paperweight, there is no

1    indication of when that claim is infringed unless the claim
2    actually means that there's infringement when the glass is
3    actually used as a paperweight.

4           If I hand you a drinking glass, and you put it on
5    the side of your table on the side of the bench, there is no
6    infringement.  You are allowed to use it as a drinking glass,
7    but you didn't.  The only time you infringe is when you
8    actually use it as a drinking glass.

9           Another example would be an online banking method.
10   Well, I shouldn't say online banking method, a banking
11   method, Your Honor, where, for example, I have a claim that
12   says I claim the steps of allowing money to be deposited and
13   the next step would be withdrawing money.  I can't withdraw
14   the money unless it was actually deposited.  So the fact that
15   I said allowing it to be deposited doesn't tell me anything,
16   unless it means it actually happened.

17          Now, in the claims at issue here, it is brought out
18   by the straightforward language of the claim.  One of the
19   claim terms that we've agreed upon the construction of, Your
20   Honor, is this term, displaying.  The claim says that you
21   display the merchant information.  But up here in the
22   allowing step, it says allowing the merchants to input
23   information.

24          Well, you can't display the information unless it
25   was actually input.  So the claim itself brings out the fact

1    that whatever happened in this allowing step must have

2    happened in order for this displaying act to occur.  It's a

3    required step.

4          Okay, Your Honor.  With respect to real time,

5    ShopNTown's construction is substantially immediately given

6    the processing limitations of the system, and ours is just

7    merely substantially immediately.

8          Now, ShopNTown's original construction was a time

9    that is substantially immediately, and we said we can work

10   with that.  It means substantially immediately, so we adopted

11   that.  But then they came back and modified it and they said,

12   you know what?  There is this new Federal Circuit case

13   Paragon Solutions which talks about processing delays and

14   processing limitations.  We want to put that into the

15   construction.

16         Well, the problem with that is if you read the

17   Paragon case, it is very clear that that Court relied very

18   heavily on the intrinsic evidence to get to that

19   construction.  There is no intrinsic evidence in this case.

20   There is no discussion at all about processing limitations.

21   They are just not there, and so we think it's inappropriate

22   to put in a limitation that has no support.  Substantially

23   immediately, we think, is the proper construction.

24         By the way, in Paragon Solutions, as I show on page

25   69, the Court did cite to some extrinsic evidence.  They

1    cited to <u>Newton's Telecom Dictionary</u>.  And the definition

2    they have for real time there, we think, more closely aligns

3    with the definition that we advocate, which is to say real

4    time means the data is processed at the moment it enters the

5    computer.

6         Your Honor, that's all I have to say on claim

7    construction.  I do want to make a few final remarks

8    concerning prior art again.  At the outset, I showed the

9    Court how Landmark's own prior art teaches exactly what

10   ShopNTown's counsel is telling you the invention is.  But

11   that's not the end of it.  There are three other pieces of

12   prior art which in our view anticipate these claims, also

13   Landmark prior art dating back to 1996 and 1997.

14        Cweb.com, also known as Career Web, was an

15   employment Web site.  It did everything the claims called

16   for.  It allowed you to select a local area.  It allowed you

17   to select an employment category, and it allowed merchants to

18   input information automatically, and allowed consumers to

19   search just as what the claim says.

20        TraderOnline.com was another Web site.  This was

21   automobiles and other such things.  Worked the same way.

22   Yachtworld, obviously that was for boats.  These all predate

23   the patent.  They significantly predate the patent.  And so

24   when ShopNTown tells you that they have an advance here, that

25   there is something new and novel, it's certainly not

1  something the patent office knew about.  The patent office

2  didn't know about this prior art.

3        Now, finally, there's a patent called Sotiroff which

4  describes almost to a tee how ForRent.com works, which is the

5  charged Web site.  And our position in this case is that to

6  read the claims on ForRent.com, reads them right onto this

7  patent and therefore into invalidity.  So I wanted to make

8  the point that all these things they've said about the

9  advance are simply not right.  There is a universe of prior

10 art out there that shows that is not the case.

11       And just a few words about ForRent.com, Your Honor.

12 ForRent.com is just an apartments Web site.  Unlike the

13 patent, it does not -- it is not a Web site that you go to

14 for online shopping.  You don't go there to find electricians

15 or beauticians or hardware stores.  You go there to look for

16 an apartment.

17       As Your Honor is aware, it is headquartered right

18 here in Norfolk.  It employs 200 salespeople.  I made it a

19 point -- we showed how the intrinsic evidence demonstrates

20 there is no human interaction.  We employ 200 salespeople.

21 We employ data entry people.  We employ reviewers.  100

22 percent of our ad placement involves human review at some

23 point, either before or after the ad is placed.

24       And 97 percent of the ad revenue involves direct

25 human interaction.  And some, Your Honor, ForRent.com

1   employees people, it employees all the things that the

2   intrinsic evidence said are not included in the claim.  The

3   data entry staff, human reviewers, order takers, they are

4   people, not machines.  Thank you, Your Honor.

5           THE COURT:  Thank you for your presentation.

6           Yes, sir.

7           MR. BAUER:  May I have a few minutes, Your Honor?

8           THE COURT:  Short.

9           MR. BAUER:  It has to be short.  I know your time

10  limit.  Just a few points.  In terms of this prior art that

11  they put up, which was their own stuff, Yacht.com and

12  TraderOnline, the last slide, those were two of those other

13  Web sites that we wanted to bring into this case that we

14  learned they claimed to be prior art in this case.  So it is

15  sort of interesting now that Your Honor says we can't get

16  discovery into those Web sites, they come in and present them

17  as prior art.

18          Now, they are giving us discovery on the prior art.

19  I'm not saying they are hiding that, but where they came in

20  earlier this morning and said, oh, this is going to blow the

21  whole case up, that is their Web site, that they are going to

22  get up here and say doesn't -- invalidates the patent but

23  that they say we can't prove infringes at the same time they

24  are saying it invalidates.  So, Your Honor, I don't know if

25  you are open to reconsider that issue, but they put it into

1    play.

2         In terms of the substantially similar -- I mean,

3    substantially automated, so while we were sitting here, I had

4    my colleague go through, and the patent is filled with terms

5    substantially automated referring to people other than the

6    merchant.  So Mr. Rocci said it's there because the merchant

7    makes it substantially automated because the merchant has to

8    touch it.  First, you took that out, it wouldn't work.  I

9    mean, you can't have an automated -- I mean, somebody has to

10   touch the data in.  But this patent talks about, uses

11   substantially automated with reference to the users.  This is

12   column -- let's see, online payment, the system is capable of

13   automated display of duration -- substantially automated

14   display.  It includes substantially automated selection of

15   business listing by users, which are the customers.  It's an

16   object of the invention to provide a substantially automated

17   system for organizing Internet information.

18        Another object is to provide a substantially

19   automated system adapted to permit Internet users to contact

20   merchants.  The whole thing -- I mean, people who wrote this

21   were making it clear substantially automated allows something

22   else, something else.  And every -- I shouldn't say every one

23   of the pages because they put up a lot of pages, but I think

24   almost all of them talk about substantially automated doesn't

25   require this or doesn't need this.  What they want to do is

1  take those words out and say substantially automated means no

2  people are involved as opposed to doesn't need people

3  involved.  They want to take out that requirement and turn it

4  into a negative limitation.

5          I'll just mention the prior art that they are

6  pointing to.  I think there is a big difference is that when

7  we get to trial, those things don't have the substantially

8  automated processing like the one that he showed you at the

9  very, very beginning.  There is nothing in there about that

10  being automated.  It talks about it being -- that there are

11  magazines going online.  I think you will find that

12  substantially automated is the key part of this invention or

13  one of the key parts.

14          The last thing, Your Honor, is the providing the

15  means and whether it's the web server.  And I just want to

16  point out, Your Honor, the claim, the preamble tells you what

17  it is we are providing.  We are providing a Web site.  We are

18  not providing an Internet, the whole thing.  We are providing

19  a Web site.  In the preamble, and in the claim says providing

20  a means to people to use that.

21          Your Honor, you need to construe the claim as the

22  invention, and, sure, you could start blowing it up and every

23  step and are you going to provide the electricity?  That

24  would be the next step.  So that is all, Your Honor.  Thank

25  you.

1        Oh, Your Honor, I'm sorry, just for the record,

2   their pages 34, 44 and 57 were the extrinsic evidence that's

3   in the book that was given to you.

4        THE COURT:  To the extent I know the Court made

5   rulings regarding the limitation of the lawsuit to challenge

6   the Web site ForRent.com, and I understand you just simply

7   made some comments about Landmark and now wants to submit

8   these Web sites to raise its prior art defense.  The Court

9   remains flexible.  I'll see where the case goes.  We'll see

10  exactly where it goes or what is raised, and I'll adjust it

11  if necessary.  But the point is to get the case litigated

12  without getting into too many extrinsic issues and matters,

13  and so that is what we are going to attempt to do.

14        In terms of the Court's schedule, the Court will

15  attempt to consolidate its ruling on these claims that you've

16  discussed today with those on claim 21 and the dependent

17  claims.  I'll try to wait until after we get the briefs from

18  you on that and see if we can quickly get back out to you an

19  opinion on the Court's view on how the claims should be

20  construed.

21        The Court will include in that order some

22  instructions about filing the motion for summary judgment on

23  the issues.  Also, back to one other thing.  With respect to

24  the motions on discovery, I do not have a plea out in front

25  of me of all those motions on discovery.

1          MR. BAUER:  Your Honor, there is only one motion
2     still pending.
3          THE COURT:  Only one pending?
4          MR. BAUER:  I'm sorry.  I thought you were asking.
5          THE COURT:  No.  That is what I want to address.
6     How many motions?  Do you know right now how many discovery
7     motions are outstanding?
8          MR. SHUMADINE:  I believe there is one, Your Honor.
9          THE COURT:  Just one?
10         MR. SHUMADINE:  That's correct, Mr. Albert?
11         MR. ALBERT:  I believe there is a second one but I
12    believe the parties are within inches of resolving.
13         MR. SHUMADINE:  There is a second one but I believe
14    the parties have agreed.
15         MR. ALBERT:  We are waiting for response from them
16    to confirm that.  That would reduce it to one.
17         THE COURT:  That is the best news I have probably
18    heard today, if you can resolve it.  If the one you have not
19    resolved goes to discovery, I want you to call up the
20    courtroom deputy for Judge Bradberry and get his schedule to
21    resolve it.  I think if it turns out to be something he
22    thinks that I ought to be resolving, he will be talking to me
23    or vice versa, but call him.
24         MR. ALBERT:  Your Honor, might I raise -- I know the
25    Court needs to leave, but just a moment, might I raise we

1    have, unfortunately, not had a chance to ask the other side

2    about this, but given what the Court just went through on the

3    schedule for trying to get to a claim construction ruling

4    here, currently the expert reports are due July 23 on this

5    side and August 6 on that side, and I wonder if the Court

6    would entertain, and if opposing counsel would be amenable,

7    to revising that so that the expert reports would be keyed to

8    a certain amount of days after the claim construction ruling,

9    otherwise, I'm afraid we are going to get expert reports that

10   don't have the benefit of the claim construction, and they

11   will, in essence, just have to be redone.

12        THE COURT:  Well, you know, throughout this

13   proceeding, as in the past, the Court has allowed the parties

14   to adjust certain timelines or ask the Court to adjust

15   certain timelines as long as they could agree without doing

16   violence to the basic schedule of the Court in terms of when

17   we are going to try the case or when the final pretrial is

18   going to be held.

19        The Court has no problem with that if you can work

20   that out with counsel, if you think it is mutually

21   beneficial.  You can't work it out, then you have to come

22   back and the Court will work it out.

23        MR. ALBERT:  Thank you, Your Honor.

24        THE COURT:  The Court is not going to hang anybody

25   if you try to make an adjustment.  If it is something you can

1    agree on, and you just simply send me an order and the Court

2    will go along with it.

3            Yes, Mr. Katchmark.

4            MR. KATCHMARK:  Your Honor, if I could just address

5    one minor point.  With respect to why the parties did not go

6    directly to the magistrate, I just want to let Your Honor

7    know, that is partially my responsibility.  I also want to

8    let you know that stamped by the federal bar, we have been

9    receiving some conflicting instructions recently.  Certain

10   magistrates have advised counsel at times that no matter can

11   go directly to them without the district court judge

12   officially sending it down.

13           THE COURT:  Okay.  Here is what we are going to do.

14   To make sure we don't have a problem, then, I think you did

15   contact Ms. Whitfield, who sits here, my courtroom deputy

16   about what you wanted to do.  I think what we will do is we

17   will continue to do it that way.  If you have some issues you

18   want to raise, contact her, we will find out what they are.

19   I will get back with you and tell you take them to the

20   magistrate or I'm going to keep them.  That will solve that

21   problem.

22           MR. KATCHMARK:  Thank you.  Is that the general

23   policy of the Court now?

24           THE COURT:  I don't know.  I'll be candid with you.

25   I'm going to tell you why I don't know because different

1    judges have different practices in here as far as running

2    their courtrooms.  But you'll note we have different standing

3    orders.

4            MR. KATCHMARK:  Yes.

5            THE COURT:  Some of us want copies of everything.

6    Some of us don't want it.  I mean, so I'm just telling you

7    what my procedure is going to be on this.  I won't speak for

8    the -- I know it makes it difficult for the bar.  That is

9    what we are doing.  That way I will know what you are taking

10   to the magistrate or ask them to take and vice versa.

11           Okay.  And I know we had a little glitch there.

12   Probably I was not in my office at the time, and I did

13   communicate by phone, and sometimes things can get a little

14   crossed up, but we will get there.  What's the date of this

15   trial again right now?

16           MR. SHUMADINE:  29th, I believe, Your Honor.

17           THE COURT:  Of what?

18           MR. SHUMADINE:  September 29th.

19           MR. ALBERT:  Last week in September.  And I've

20   forgotten now how many days we set aside for it, but it was

21   several.

22           THE COURT:  Well, we are hoping with all the lawyers

23   in here, this legal genius in here cannot figure out how to

24   resolve this case, we are in trouble.  But we will see what

25   happens between now and September the 29th.

```
 1          The Court remains hopeful, since the Court just had
 2     another one to come in here in the last couple of days, and
 3     another one behind that, this is patent fever going on around
 4     here.  But at any rate, unless there is something else, the
 5     Court will be in recess.
 6          (Hearing adjourned at 3:49 p.m.)
 7                         CERTIFICATION
 8
 9        I certify that the foregoing is a correct transcript
10     from the record of proceedings in the above-entitled matter.
11
12
13          X_____/s/_____x
14                    Jody A. Stewart
15                    X_____x
16                         Date
17
18
19
20
21
22
23
24
25
```