

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

SHOPNTOWN, LLC,

         Plaintiff,

v.                                                   CIVIL ACTION NO. 2:08cv564

LANDMARK MEDIA ENTERPRISES, LLC,

         Defendant.

## MEMORANDUM OPINION AND ORDER

This matter stems from Shopntown, LLC's ("Plaintiff") claims against Landmark Media

Enterprises, LLC ("Defendant") alleging that Defendant has infringed one patent, in violation of

35 U.S.C. § 271(a)-(c), by making, using, offering to sell, and/or selling within the United States

an on-line business referral system that operates in direct accord with the language of the claims

of Plaintiff's patent. The matter before the Court is the claim construction of several terms found

in U.S. Patent No. 6,968,513 ("513 Patent").  The Court conducted a *Markman* hearing on July

13, 2009 to construe the following terms: (1) *allowing the one or more merchants to select at*

*least one of the localized geographic areas and at least one of the topical categories*, (2)

*allowing the one or more merchants to input information into the system*, (3) *substantially*

*automated process*, (4) *direct access to modify, add and remove the information*, (5) *means for*

*the one or more merchants to connect to at least one web page of the one or more web pages*,

(6) *means for the one or more merchants to update or edit merchant information*, and (7) *real*

*time*.

# I. BACKGROUND

This case involves technology for an on-line business referral system. The '513 Patent, titled "On-Line Localized Business Referral System and Revenue Generating System," was filed in March 1999 and issued in November 2005. The '513 Patent describes a web site for directing consumers to their local merchants through a merchant category selection process When the initial patent application was filed, the Internet was still in its infancy and certain functionality on web sites was limited. According to Plaintiffs, before the inventors filed their patent application, prior art systems employed "search engines" to search for information about a business within a geographic area. The '513 Patent describes many problems inherent in using a search engine to obtain information on goods and services in a localized geographic area. Such problems included return of voluminous results that would "take a tremendous amount of time" to review. Plaintiff explained that using search engines made it difficult for merchants to effectively target their advertising and other materials to consumers interested in certain services in a specific geographic area. Finally, Plaintiff noted that there was no central database for organizing the merchant information relating to goods and services within a specific geographic location and no way for consumers efficiently and reliably locate such merchant information.

The '513 Patent sought to solve the problems of the prior art through systems and methods that: (1) organize Internet information from merchants into geographical and topical categories and (2) allow consumers to search for, and view, such information by selecting the geography and topical category they want. As proposed in the '513 Patent, merchants may create and post web listings of the goods or services that they provide according to the localized geographic areas where those merchants want exposure. Additionally, consumers may visit the web site and locate only those merchants that listed their goods and services in the consumer's

2

chosen geographic area.  Users of the systems and methods claimed and disclosed in the '513

Patent initially select a geographic area of interest.  Once the geographic area is selected, the user

is directed toward a second web page that is specific for that selected geographic area.  Such web

page would contain information of goods and services offered by merchants or other users in that

geographic area.  The Patent also offers that the second web page may link to other web pages

containing information created and posted by the merchants.  Finally, the merchants incur

charges based on the information that they put on the web site.

Plaintiff asserts that Defendant has infringed on eighteen (18) of the '513 Patent's fifty-

five (55) claims; however, the Court finds it proper to construe five (5) terms related to Claim 40

and two (2) terms from its dependant claims.[1]  Only language in three (3) of the claims discussed

in this Memorandum Opinion and Order–Claims 40, 48, and 51–is disputed.

Independent Claim 40 provides as follows (with highlighted language for construction):

> A method for providing an on-line interactive website for referring a consumer to
> one or more merchants or other users and for increasing access to localized
> business and markets, the method comprising the steps of:
>
>> providing one or more pages containing information organized into a
>> hierarchy of geographic areas that allows the merchants and consumers to
>> select from at least one topical category in a plurality of localized
>> geographic areas to input or view localized information, wherein
>> merchants in the localized geographic areas may direct the information to
>> localized markets so as to provide greater exposure to the merchants
>> within the localized geographic areas;
>>
>> providing *means for the one or more merchants to connect to at least
>> one web page of the one or more web pages*;

---

[1] As established in the claim construction hearing on July 13, 2009, upon receipt of the parties'
proposed constructions on Independent Claim 21 and its Dependant Claims, the Court will
issue an additional Memorandum Opinion and Order resolving the remaining disputed claim
language.

> *allowing the one or more merchants to select at least one of the localized geographic areas and at least one of the topical categories* to list or display information pertaining to the one or more merchants;

> allowing the one or more merchants to input information into the system for viewing by the consumers on the one or more web pages through a *substantially automated process*, wherein the information is accessible on the one or more web pages under the localized geographic areas and topical categories selected by the one or more merchant, and wherein the merchant has *direct access to modify, add or remove the information*;

> connecting the consumer to one or more web pages;

> *allowing the consumer to select at least one topical category from at least one localized geographic areas*;

> displaying the merchant information in response to the geographic area and topical category selected by the consumer;

> monitoring the information that is accessed;

> providing statistics regarding the information accessed; and

> generating revenue based on the information that is inputted by the merchants.

Dependent Claim 48 reads:

> The method of claim 40 which further comprises the step of *providing means for the one or more merchants to update or edit the merchant information*.

Dependent Claim 51 reads:

> The method of claim 40 wherein the inputting of information occurs in *real time*.

## II. LEGAL STANDARD

Claim construction is "a question of law, to be determined by the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996). In construing claims, the court must first look first to the intrinsic evidence in the record, i.e. the claims, the specification, and the prosecution history. *Markman v. Westview Instruments, Inc.* 52 F.3d 967, 979 (Fed. Cir. 1995),

4

*aff'd* 517 U.S. 370 (1996). Claim construction begins with determining how a person of ordinary skill in the art understands a claim term as of the filing date of the patent application. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005), *cert denied*, 546 U.S. 1170 (2006). In the unlikely event that the intrinsic evidence is insufficient to determine the acquired meaning of the claim language, the court may rely on extrinsic evidence, i.e. dictionaries, treatises, publications, and expert testimony. *See id*; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1585 (Fed. Cir. 1996).

## A. Claim Language

The court's claim construction analysis must begin with the words of the claim. "[T]he words of a claim 'are generally given their ordinary and customary meaning' . . . the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312-13 (quoting *Vitronics*, 90 F.3d at 1582). This ordinary meaning "may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1313. If the meaning of a term is not immediately apparent, courts must look to the written description and prosecution history to provide guidance as to the meaning of the claim terms. *Id.* at 1314. In analyzing the claim language, the court must analyze the context in which the term appears and other claims of the patent to gain insight on the patentee's intention for the claim definition. "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.*

## B. Specification

The specification contains a written description of the invention, the manner and process

5

of making and using it, and the best mode contemplated by the inventor of carrying it out. *See* 35 U.S.C. § 112. "It is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Vitrionics*, 90 F.3d at 1582; *see Phillips*, 415 F.3d at 1315. However, there is a distinction between using the specification to analyze claim terms and incorporating limitations from the specification into the claim language. *See Phillips*, 415 F.3d at 1323; *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 904 (Fed. Cir. 2004).

**C. Prosecution History**

The prosecution history contains the complete record of all proceedings before the Patent and Trademark Office ("PTO"), including any express representations made by the applicant regarding the scope of the claims. The prosecution history is useful in determining how the inventor understood the patent and invention, and may provide evidence that the inventor limited the invention during the course of prosecution, thus restricting the scope of the claim language. *Phillips*, 415 F.3d at 1317. However, the court should not rely too heavily on the prosecution history because it "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, [such that] it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

**D. Extrinsic Evidence**

A court may also consider extrinsic evidence, "which consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317-19. However, extrinsic evidence should not be used "to contradict claim meaning that is unambiguous in the light of the intrinsic evidence." *Id.* at 1324. Judges may consult such resources to better understand the underlying technology and to

6

aid in construing claim terms, "so long as the dictionary definition does not contradict any

definition found in or ascertained by a reading of the patent documents." *Id.* at 1322-23.

Extrinsic evidence has been found to be generally less reliable than intrinsic evidence and

accordingly should be considered in light of the intrinsic evidence. If analysis of the intrinsic

evidence will resolve any ambiguity, it is improper to consider extrinsic evidence in determining

the meaning of the claims. *Id.* at 1320.

## III. DISCUSSION

### A. Stipulated Definitions

Prior to the *Markman* hearing, the parties agreed on definitions for a number of terms.

For independent claim 40, the parties stipulated to six terms.[2] *A hierarchy of geographic areas*

is defined as "geographic areas organized into tiers." *To select from* is defined as "to choose or

pick from." *Topical category* is defined as "a grouping of items defined by a common

characteristic." *Localized geographic area(s)* is defined as "a geographic area narrowed from

the whole of geographic areas." *Provide greater exposure to the merchants within the localized*

*geographic area(s)* is defined as "provide more exposure to those merchants who posted a

listing in the localized geographic area(s) they selected." *Displaying the merchant information*

*in response to the geographic area and topical category selected by the consumer* is defined as

"showing the merchant information on a user's computer screen in response to the consumer

picking a geographic area and topical category." Although the corresponding structure for

*means for the one or more merchants to connect to at least one web page of the one or more*

*web pages* has not been agreed upon, the parties agree that it is a means-plus-function term and

---

[2] Five of the agreed upon terms also apply to Claim 21.

the claimed function is "enabling the merchants to access one or more of the web pages."

The parties also stipulated to certain terms in dependant claims 41, 42, 43, 47, 48, and 50. *Calculating fees based on the information accessed* is defined as "determining fees based upon the input information." *Providing extended services* is defined as "providing additional services beyond referring a consumer to one or more merchants or other users." *Providing commercial transactions* is defined as "providing a transaction that relates to commerce." *Generating revenue from the one or more merchants for listing the merchant information in the hierarchy of geographic areas and topical categories* is defined as "charging fees to the merchants for the listings." Although the corresponding structure for *means for the one or more merchants to update or edit the merchant information* has not been agreed upon, the parties agree that it is a means-plus-function term with the function defined as "allowing merchants, after being authenticated, to themselves alter their own information." *Drill-down menus* are defined as "one or more choices presented in a menu after selecting a choice in a hierarchical menu." (07/08/09 Letter re: claim construction, Doc. #78.; Hr'g Tr. 40-41.)

**B. Claim Construction:** *allowing*

The term *allowing* appears three times in Claim 40; however, the parties dispute its construction in only two phrases. The phrases at issue read:

> *allowing the one or more merchants to select at least one of the localized geographic areas and at least one of the topical categories* to list or display information pertaining to the one or more merchants;
> . . .
> *allowing the one or more merchants to input information into the system* for viewing by the consumers on the one or more web pages;

Plaintiff asserts that *allowing* in each of these phrases means permitting. Defendant asserts that *allowing* means that the task must actually be completed for the next steps to occur. In other

words, Defendant asserts that, rather than merely "permitting," the element requires that the merchant "actually" select a geographic area and topical category and "actually" input information into the system. (Def.'s Mem. Supp. Proposed Claim Constr. 14; Hr'g Tr. 106-08.) Defendant argues that all steps must actually be carried out in order for infringement to occur. (Def.'s Mem. Supp. Proposed Claim Constr. 14.) The Court does not disagree with Defendant's assertion regarding requirements for infringement; however, the issue as to if and how many merchants actually pick may be a damages issue addressed later in the lawsuit and is not properly at issue in claim construction.

The ordinary meaning of *allowing* is letting happen or permitting. (The American Heritage Dictionary of the English Language, 4th Ed. (2004)). As used in the claim, *allowing* does not mean that the acts accompanying the term must take place or "requiring," as Defendant proposes. There is no mandatory connotation to this word as used in the claim and throughout the Patent. Rather, in this claim and in other claims in this Patent, the term is used in a passive and permissive way. The Court finds no special or extraordinary meaning given to *allowing* in the Patent, nor does the patentee use language that limits or disavows its plain usage. Moreover, Defendant has not offered sufficient support to overcome the presumption that the word *allowing* means anything other than its ordinary meaning.

Because there is nothing in the patent history or specification that contradicts the ordinary English definitions, the Court interprets the phrase *allowing the one or more merchants to select at least one of the localized geographic areas and at least one of the topical categories* as means "permitting one or more merchants to choose or pick at least one localized geographic area and at least one topical category." Furthermore, *allowing the one or more merchants to input information into the system* means "permitting one or more merchants to create and post

9

information to the system."[3]

## C. Claim Construction: *substantially automated process*

Both parties appear to agree that *automated process* means "without human interaction"; however, the parties differ on the meaning of *substantially* and its effect on the level of human interaction. Defendant asserts that *substantially automated process* means "a process that takes place without human interaction such that the need for data entry staff or human screening of the information is eliminated." Relying on language in the patent specification and prosecution history, Defendant argues that Plaintiff's patent eliminates the need for human intervention. Defendant states that the more narrow definition was established when Plaintiff bargained with the PTO in order to overcome the prior art. (Def.'s Answer Mem. 4.) Relying on the terms "without," "eliminated," and "does not require," Defendant argues that Plaintiff previously admitted to these limitations and Plaintiff's current construction is in direct conflict with it's own PTO arguments.

Plaintiff asserts that the term means "a process that largely takes place without human interaction." Plaintiff points to the prosecution history where references to the process always describe it as *substantially* automated. Plaintiff also cites Federal Circuit case law and the English dictionary to support its argument that the word *substantially* must have meaning in the claim and can mean "significantly," "considerably," "largely," or "essentially." (Pl.'s Opening Claim Constr. Br. 15; Hr'g Tr. 62.) Plaintiff further argues that, by requiring the process to take

---

[3] *Input* appears at various points throughout the '513 Patent. Defendant offers that the term means "to create or post." Plaintiff has not proposed a definition. It is clear from the prosecution history that the patentee intended *input information into the system* to encompass creating and posting information into the system. (*See* Pl.'s Claim Constr. Reply Brief 14) ((citing Joint App. A568, Mar. 24, 2004 Decl.) ("[T]he present invention *permits the user to create and post . . . information onto the system* using a substantially automated process.")) (emphasis added).

10

place entirely without human interaction, Defendant's construction reads the word *substantially* out of the claim. Plaintiff's use of "largely without" to measure the level of human interaction does little to clarify the claim term. However, if Defendant's proposed construction were adopted, the word *substantially* would be re-defined to mean "entirely" and would otherwise be meaningless.

In analyzing the language of the claim, the Court must determine how a person of ordinary skill in the art would understand the term *substantially automated process*. Both a person of ordinary skill in the art and a layperson would understand that an automated process means that the process is not driven by human interaction. A person of ordinary skill would also understand that there may be some human interaction involved in the process. However, a person of ordinary skill could not determine from the claim language how much human interaction would be involved in a process that was substantially automated.

The Court must also look at the specification to determine the proper construction of the claim language. The '513 Patent specification expresses that the embodiments shown and described are "preferred embodiments," as the heading above the descriptions upon which Defendant relies reads "Detailed Description of the Preferred Embodiment." (Joint App. A80, 10:16-17.) The description of the embodiment states that "merchants can [interact with the system] directly and by themselves" (5:16-20); information can be organized "without the need for employing a large personnel staff . . ." (5:4-5); "operations . . . are all handled online, without the need for a human order taker or processor" (6:65 - 7:1); and "the need for data entry staff or human screening of the information is eliminated" (5:63-68). (Joint App. A78-A79.)

Next, the Court looks to the prosecution history "to determine whether it contains statements that narrow the scope of the claims." *Phillips*, 415 F.3d at 1317. During the

11

prosecution of the patent, parties may make statements that clearly restrict the scope of the patent. "This may occur, for example when the patentee explicitly characterizes an aspect of his invention in a specific manner to overcome prior art." *Id.* (internal citations omitted).  In distinguishing this patent from prior art the patentee stated: "Unlike the prior art, the present invention does not require the information to be reviewed and/or inputted by a human being associated with the system operator or third party prior to the information being posted onto the web page . . . ." (Joint App. A557.)  On this basis, the patentee distinguished its patent from the prior art.  In reviewing the prosecution history, the Court does not find any evidence that Plaintiff made any explicit disavowal of scope during the prosecution of the '513 Patent.  The fact that the claim does not require human interaction does not equate to the claim precluding human interaction.

There is a distinction between construing a claim in light of the specification and inserting a limitation into the claim from the specification. *Phillips*, 415 F.3d at 1323.  Here, the specification supports the Court's reading of the claim based on the claim language that merchants may input information for viewing by consumers through a substantially automated process.  However, if the Court were to find that the *substantially automated process* takes place without any human interaction, the Court would be reading a limitation into the claim from the specification, which is not appropriate.  Additionally, while the prosecution history supports a finding that human interaction for the instant claim would be limited, such interaction is not precluded or prohibited.  Accordingly the Court **FINDS** that *substantially automated process* as defined in the '513 Patent means "process that takes place with minimal, if any, human interaction."

**D. Claim Construction:** *direct access to modify add or remove information*

Plaintiff asserts that *direct access to modify add or remove information* means "the ability to edit the information that was previously input into the system." Plaintiff argues that no reasonable construction of this claim limitation excludes information not entered by the "substantially automated process." (Pl.'s Opening Claim Constr. Br. 14-16.) Defendant asserts that the term means "merchants can edit the information that was previously created on the system through the automated process." Defendant focuses on the nature of the information that can be edited, arguing that such information is limited to the information that the merchants entered through the automated process.

Both a person of ordinary skill in the art and a lay person would understand that the claim term refers to editing the information that was previously input into the system. However, nothing in the language of the claim suggests that the information that may be edited must have been initially entered through the substantially automated process. Moreover, as determined above, the substantially automated process allows for minimal, if any, human interaction. Defendant's attempt to characterize the information being edited by limiting it to information "created . . . using the automated process" is unnecessary and is not supported by the specification or prosecution history. Therefore, the Court will not read such limitation into the claim. Accordingly the Court **FINDS** that *direct access to modify add or remove information* as defined in the '513 Patent means "the ability to edit the information that the merchant previously created or posted into the system."

**E. Claim Construction:** *means for the one or more merchants to connect to at least one web page of the one or more web pages*

Both parties agree that *means for the one or more merchants to connect to at least one*

13

*web page of the one or more web pages* is a means-plus-function term. The parties also agree that the term as defined in the '513 Patent functions as "enabling the merchants to access one or more of the web pages." Plaintiff asserts that the structure "includes a server which hosts one or more web pages, and is accessible by or connected to the Internet." Defendant asserts that the structure includes at least "[a] merchant['s] personal computer operating a web browser and communicating with the web server via the Internet using the modem." (Hr'g Tr. 101.)[4]

In examining the language of the claim, the Court notes that the term refers to connecting the merchants to the web pages without the additional requirement of actually connecting the merchants to the Internet itself.[5] The ordinary meaning of this term is apparent from the claim language. The function of the term is to enable the merchants to access one or more of the web pages and the corresponding structure is the web server which hosts such web pages. While Defendant argues that the corresponding structure also requires specific hardware facilitating the merchant's ability to connect to the Internet, neither the specification nor prosecution history support this additional requirement.

In examining the specification, the preferred embodiments contemplate how a user may connect to the Internet and subsequently view the patented web site. For example, Figure 54 of the Joint Appendix shows a schematic diagram of the general structure of the Internet and

---

[4] Because Defendant described the structure using various, but substantially similar, constructions, the Court used the construction proposed during the *Markman* hearing. In another of Defendant's proposals, the structure "includes, in combination, a personal computer, a port server, a point of presence (POP) router, a hypertext transport protocol (HTTP) server, and a file server, where the PC is connected to the modem, the modem is connected to the port server, the port server is connected to the POP router, and the HTTP server is connected to the file server." (Def.'s Mem. Supp. Proposed Claim Constr. 20.)

[5] This distinction makes Defendant's attempt to analogize the instant claim and the claim at issue in *Netcraft Corp. v. Ebay, Inc.*, 549 F.3d 1394 (Fed. Cir. 2008), inapposite.

includes internet equipment and hardware that may potentially be used to connect to the Internet. ( A73; A80 10:9-10.) This hardware includes: a routing hub; POP router; HTTP Server, File Server; Port Server; LAN server; modem; and PC. (Joint App. A73.) Although such hardware may be used to connect to the Internet, the specification does not establish that the use of such hardware is the only way a user can utilize the Internet. Further, the claim provides for connecting to an interactive web site, not connecting to the Internet or to a web server.

In describing how the web page is displayed and accessible to the users, the specification describes one or more servers for linking users to the web pages. (Joint App. A81 11:10-16.) However, the preferred embodiment outlines one of several methods to connect to the Internet, and Figure 54 displays how the Internet could work using one of several combinations of Internet equipment. The list of necessary equipment that Defendant offers as the corresponding structure is part of the Internet system and is not required for the instant claim. As previously stated, there is a distinction between construing a claim in light of the specification and inserting a limitation into the claim based on preferred embodiments. *Phillips*, 415 F.3d at 1323. The Court cannot find that the corresponding structure that enables the merchant to access the web page includes the mandatory internet equipment and hardware itemized by Defendant, nor is such breakdown necessary to reasonably interpret the claim. Therefore, the Court will not read such limitation into the claim from the specification. Accordingly, the Court **FINDS** that ***means for the one or more merchants to connect to at least one web page of the one or more web pages*** as defined in the '513 Patent is a means-plus-function term, with the function defined as "enabling the merchants to access one or more of the web pages" and the corresponding structure being "a server which hosts one or more web pages, and is accessible by or connected to the Internet."

15

**F. Claim Construction:** *means for one or more merchants to update or edit merchant information*

The term *means for one or more merchants to update or edit merchant information* appears in Claim 48 of the '513 Patent. Both parties agree that the term is a means-plus-function term. The parties also agree that the term as defined in the '513 Patent functions as "allowing merchants, after being authenticated, to themselves alter their own information." The parties' dispute over the corresponding structure for this term parallels the arguments presented for the means-plus-function term construed in Section E, above. Plaintiff asserts that the structure "is a web page running on a server which allows the merchant to update or edit the merchant information . . . ." (Hr'g Tr. 77.) Plaintiff also includes in its proposed structure a reference to "the Account Managers shown in alternative Figs. 19 and 19A, running on a server . . . ." (*Id.*) Defendant asserts that the structure includes the Internet equipment shown in Figure 54 and is the same as that offered in the means-plus-function term construed for Claim 40.[6]

As discussed above, the specification suggests a structure for accessing or connecting to the patented web site rather than accessing or connecting to the Internet. Therefore, rather than the corresponding structure being such that includes Internet hardware or equipment, a web page, running on a server, with the requisite software that allows merchants to modify their information, is sufficient. Further, although the Court recognizes that Figures 19 and 19A illustrate the preferred embodiments of such software, a reference to such figures is not necessary to define the structure. Accordingly the Court **FINDS** that *means for one or more merchants to update or edit merchant information* as defined in the '513 Patent means "allowing merchants,

---

[6] The Court was unable to identify a clear recitation of Defendant's proposed structure for this term.

after being authenticated, to themselves alter their own information" and the corresponding structure is "a web page running on a server which allows the merchant to update or edit the merchant information."

## G. Claim Construction of "real time"[7]

The term *real time* appears in Claim 51 of the '513 Patent. Plaintiff asserts that the term means "substantially immediately, given processing limitations." Plaintiff further argues that the Federal Circuit's definition, as stated in *Paragon Solutions, LLC v. Timex Corp.*, 556 F.3d 1075 (Fed Cir. 2009), is applicable to the instant claim term. Defendant, however, asserts that the term means "substantially immediately" without any additional limiting language. Defendant argues that *real time* is a term of art and is not defined in the '513 Patent or in the prosecution history. Defendant further argues that the construction established in *Paragon* is inappropriate to the instant claim because the *Paragon* court relied on intrinsic evidence, whereas there is no intrinsic evidence in the instant case regarding processing limitations. Finally, Defendant explains that, unlike the invention in *Paragon*, there is no need to qualify the timeliness of the processing once the merchant has created and posted the information to the system.

The Court finds neither the specification nor the patent prosecution history useful in defining this term. Since the intrinsic evidence does not provide meaningful guidance as to the proper construction of the term, the Court finds it appropriate to consult the Federal Circuit's opinion in *Paragon*. The court in *Paragon* spent a great deal of time on the intrinsic evidence regarding the claimed system's ability to process, transmit and calculate the data being displayed. Unlike the claimed system in *Paragon*, the system claimed in the '513 Patent does not require

---

[7] Both parties' proposed constructions for this term changed from what was offered in the claims construction briefs.

17

measurement of data requiring the passage of time; instead, the instant Patent claims "inputting

of information that occurs in real time," which does not require the processing or calculation

extensively discussed in *Paragon*. This Court finds that the limiting language regarding

intentional delay and processing limitations, as announced in *Paragon*, is inapplicable to the '513

Patent. Neither intrinsic nor extrinsic evidence for the instant claim supports such additional

limitations. Accordingly the Court **FINDS** that *real time* as defined in the '513 Patent means

"substantially immediately."

## IV. CONCLUSION

For the foregoing reasons, the Court **FINDS** that the terms in the '513 Patent are defined

as follows: ***Allowing the one or more merchants to select at least one of the localized***

***geographic areas and at least one of the topical categories*** means "permitting one or more

merchants to choose or pick at least one localized geographic area and at least one topical

category." ***Allowing the one or more merchants to input information into the system*** means

"permitting one or more merchants to create and post information to the system." ***Substantially***

***automated process*** means "process that takes place with minimal, if any, human interaction."

***Direct access to modify add or remove information*** means "the ability to edit the information

that the merchant previously created and posted to the system." ***Means for the one or more***

***merchants to connect to at least one web page of the one or more web pages*** is a means-plus-

function term, with the function being "enabling the merchants to access one or more of the web

pages" and the structure being "a server which hosts one or more web pages, and is accessible by

or connected to the Internet." ***Means for one or more merchants to update or edit merchant***

***information*** is a means-plus-function term, with the function being "allowing merchants, after

being authenticated, to themselves alter their own information" and the structure being "a web

18

page running on a server which allows the merchant to update or edit the merchant information."

*Real time* as defined in the '513 Patent means "substantially immediately."

The Clerk is **DIRECTED** to mail a copy of this Memorandum Opinion and Order to counsel for the parties.

**IT IS SO ORDERED.**

_____
Raymond A. Jackson
United States District Judge

Norfolk, Virginia
July 22, 2009